**Case No. 15-1779**

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

---

Tamesha Means,

Plaintiff-Appellant,

v.

United States Conference Of Catholic Bishops, a not for profit corporation, Stanley Urban, Robert Ladenburger, and Mary Mollison,

Defendants-Appellees.

---

On Appeal from the
United States District Court for the Western District of Michigan

---

**BRIEF ON APPEAL OF DEFENDANTS-APPELLEES STANLEY URBAN, ROBERT LADENBURGER, AND MARY MOLLISON**

Bodman PLC
By:   Dennis J. Levasseur (P39778)
      Thomas Van Dusen (P30602)
      Michael J. Serra (P77741)
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
dlevasseur@bodmanlaw.com
tvandusen@bodmanlaw.com
mserra@bodmanlaw.com
313.259.7777
Counsel for Defendants/Appellees Stanley Urban,
Robert Ladenburger, and Mary Mollison

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: _____     Case Name: _____

Name of counsel: _____

Pursuant to 6th Cir. R. 26.1, _____
*Name of Party*
makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

---

### CERTIFICATE OF SERVICE

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/_____

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ..................................................1

STATEMENT OF ISSUES PRESENTED ..........................................................2

STATEMENT OF THE CASE ...........................................................................3

I.   MS. MEANS FRAMES HER MEDICAL MALPRACTICE ACTION AS "INDEPENDENT NEGLIGENCE" TO ATTACK CATHOLIC HEALTH CARE ...............................3

II.  THE USCCB ISSUED DIRECTIVES TO GUIDE CATHOLIC HEALTH CARE SERVICES. .........5

III. THE CASE WAS DISMISSED BECAUSE MS. MEANS FAILED TO STATE A CLAIM AND ALSO BECAUSE THE FIRST AMENDMENT BARRED ADJUDICATION. ....................................7

STANDARDS OF REVIEW ..........................................................................10

SUMMARY OF ARGUMENT ........................................................................11

ARGUMENT ..............................................................................................13

I.   BOARD MEMBERS OF A HEALTH SYSTEM'S CATHOLIC SPONSOR DO NOT OWE A DUTY OF CARE TO PATIENTS OF AN AFFILIATED HOSPITAL ...............................13

     A.   Medical malpractice cases do not establish that the Individual Defendants owed Ms. Means a duty of care. ..................................13

     B.   Ms. Means' non-Michigan authority is neither helpful nor a substitute for controlling Michigan precedent ..................................19

II.  THIS ACTION REQUIRES INTERPRETING RELIGIOUS DOCTRINE AND DECIDING WHETHER IT IS REASONABLE HOSPITAL POLICY, THUS IMPLICATING THE FIRST AMENDMENT. ....21

III. VENUE IS PROPER IN THE WESTERN DISTRICT OF MICHIGAN. ....................................31

     A.   Ms. Means failed to establish venue under 28 U.S.C. §1391(b)(2). ..............31

     B.   The district court did not abuse its discretion in transferring venue under 28 U.S.C. §1404(a). ..................................33

CONCLUSION ............................................................................................36

CERTIFICATE OF COMPLIANCE ..................................................................37

CERTIFICATE OF SERVICE .........................................................................37

i

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**................................................**38**

Detroit_9831913_3

## TABLE OF AUTHORITIES

### Cases

*Adler v. Avis Rent-A-Car Sys., Inc.*,
  391 F.Supp. 466 (E.D. Wisc. 1975) ....................................................35

*Anonymous v. Kaye*,
  104 F.3d 355 (2d Cir. 1996) ...............................................................31

*Armstrong v. A.I. Dupont Hosp. for Children*,
  60 A.3d 414 (Del. Super. Ct. 2012).....................................................19

*Atlantic Marine Const. Co. Inc. v. U.S. Dist. Ct. for W. Dist. Of Tx.*,
  __ U.S. __, 134 S.Ct. 568 (2013) .......................................................31

*Bailey v. Schaaf*,
  835 N.W.2d 413 (Mich. 2013) .............................................................19

*Bible Way Church of Our Lord Jesus Christ of Apostolic Faith of Wash. D.C. v. Beards*,
  680 A.2d 419 (D.C. Cir. 1996).............................................................28

*Biegas v. Quickway Carriers, Inc.*,
  573 F.3d 365 (6th Cir. 2009)...............................................................13

*Broder v. Corr. Med. Servs., Inc.*,
  No. 03-75106, 2008 WL 704229 (E.D. Mich., 2008)..........................20

*Bryant v. Oakpointe Villa Nursing Ctr.*,
  684 N.W.2d 864 (Mich. 2004) .............................................................19

*Bryce v. Episcopal Church in Diocese of Colo.*,
  121 F.Supp.2d 1327 (D. Colo. 2000) ...................................................28

*Bunting ex. rel. Gray v. Gray*,
  2 Fed. Appx. 443 (6th Cir. 2001) ........................................................33

*Carleto v. Shore Mem'l Hosp.*,
  350 A.2d 534 (N.J. Super. Ct. Law Div. 1975)....................................20

*Chesser v. LifeCare Mgmt. Servs., LLC*,
  356 S.W.3d 613 (Tex. Ct. App. 2011) .................................................20

iii

*Chrisman v. Sisters of St. Joseph of Peace*,
  506 F.2d 308 (9th Cir. 1974) .............................................................................30

*Cox ex rel. Cox v. Bd. of Hosp. Managers for City of Flint*,
  651 N.W.2d 356 (Mich. 2002) ...........................................................................8

*D'Ambrosio v. Marino*,
  747 F.3d 378 (6th Cir. 2014) .............................................................................10

*Doe v. Klein*,
  254 Fed. Appx. 626 (9th Cir. 2007) ...................................................................32

*Downs v. Saperstien Assocs.*,
  697 N.W.2d 190 (Mich. Ct. App. 2005) ............................................................14

*Gen. Conference Corp. of Seventh-Day Adventists v. McGill*,
  617 F.3d 402 (6th Cir. 2010) .............................................................................27

*Gen. Council on Fin. & Admin. of the United Methodist Church v. Super. Ct. of Cla.*,
  439 U.S. 1355 (1978) ........................................................................................27

*Hill v. Sears, Roebuck & Co.*,
  822 N.W.2d 190 (Mich. 2012) ..........................................................................13

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
  __ U.S. __, 132 S.Ct. 694 (2012) .....................................................................26

*In re Link_A_Media Devices Corp.*,
  662 F.3d 1221 (Fed. Cir. 2011) .........................................................................34

*In re Ralston Purina Co.*,
  726 F.2d 1002 (4th Cir. 1984) ...........................................................................35

*Jones v. Wolf*,
  443 U.S. 595 (1979) ..........................................................................................26

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*,
  344 U.S. 94 (1952) ............................................................................................22

*Kerobo v. Sw. Clean Fuels, Corp.*,
  285 F.3d 531 (6th Cir. 2002) .............................................................................10

iv

*Kreipke v. Wayne State Univ.*,
   807 F.3d 768 (6th Cir. 2015) ................................................................................10

*Lukas v. McPeak*,
   730 F.3d 635 (6th Cir. 2013) ................................................................................10

*Lundman v. McKown*,
   530 N.W.2d 807 (Minn. Ct. App. 1995) ............................................................29

*Malicki v. Doe*,
   814 So.2d 347 (Fla. 2002) ...................................................................................27

*Marcelletti v. Bathani*,
   500 N.W.2d 124 (Mich. Ct. App. 1993) .............................................................14

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*,
   196 F.3d 409 (2d Cir. 1999) ................................................................................27

*May v. Mercy Mem'l Nursing Ctr.*,
   2009 WL 131699 (E.D. Mich. Jan. 20, 2009) ....................................................18

*Medina v. Catholic Health Initiatives*,
   No. 13-cv-01249, 2015 WL 8144956 (D. Colo. Dec. 8, 2015) ...........................4

*Mitchell v. Helms*,
   530 U.S. 793 (2000) .............................................................................................22

*Mount Elliot Cemetery Ass'n v. City of Troy*,
   171 F.3d 398 (6th Cir. 1999) ..............................................................................15

*Murdock v. Higgins,*
   527 N.W.2d 1 (Mich. Ct. App. 1995), *aff'd*, 559 N.W.2d 639 (Mich. 1997).....14

*Myers v. Bennet Law Offices*,
   238 F.3d 1068 (9th Cir. 2001) .............................................................................33

*N.L.R.B. v. Catholic Bishop of Chicago*,
   440 U.S. 490 (1979) .............................................................................................26

*Ogle v. Hocker*,
   279 Fed. Appx. 391 (6th Cir. 2008) ....................................................................22

Detroit_9831913_3

*Overall v. Ascension*,
　23 F.Supp.3d 816 (E.D. Mich. 2014) ................................................................23

*Paterek v. Village of Armada*,
　801 F.3d 630 (6th Cir. 2015) ..............................................................................11

*Piedmont Label Co. v. Sun Garden Packing Co.*,
　598 F.2d 491 (9th Cir. 1979) ..............................................................................31

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*,
　393 U.S. 440 (1969) ............................................................................................30

*Roberts v. Salmi*,
　866 N.W.2d 460 (Mich. Ct. App. 2014) ............................................................15

*Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*,
　426 U.S. 696 (1976) ............................................................................................26

*Smith v. Aegon Cos. Pension Plan*,
　769 F.3d 922 (6th Cir. 2014) ..............................................................................10

*Theophelis v. Lansing Gen. Hosp.*,
　66 N.W.2d 249 (Mich. Ct. App. 1985) ..............................................................16

*Theophelis v. Lansing Gen. Hosp.*,
　384 N.W.2d 823 (Mich. Ct. App. 1986) ............................................................16

*Theophelis v. Lansing Gen. Hosp.*,
　424 N.W.2d 478 (Mich. 1988) ...........................................................................16

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
　450 U.S. 707 (1981) ............................................................................................22

*Wildearth Guardians v. U.S. Bureau of Land Mgmt.*,
　92 F.Supp.2d 51 (D. D.C. 2013) ........................................................................35

*Woodke v. Dahm*,
　70 F.3d 983 (8th Cir. 1995) ................................................................................32

*Zaluski v. United Am. Healthcare Corp.*,
　527 F.3d 564 (6th Cir. 2008) ..............................................................................10

Detroit_9831913_3

**Statutes**

28 U.S.C. §1391(b)(2)...................................................................31

28 U.S.C. §1404(a) .......................................................................33

M.C.L.A. §600.5805(6) ................................................................3

**Other Authorities**

1983 Code c.113, §2 .....................................................................4

Edward A. Hartnett, <u>Catholic Judges and Cooperation in Sin,</u>
    4 U. St. Thomas L.J. 221 (Fall 2006).....................................24

**Rules**

Fed. R. Civ. P Rule 12(b)(6) ......................................................10

Detroit_9831913_3

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendants-Appellees Stanley Urban, Robert Ladenburger, and Mary Mollison (the Individual Defendants) request oral argument to address whether religious based policies, adopted by the board of a Catholic health care system which is not a party to this action, can form the sole basis of a negligence claim against only some of those board members.

## STATEMENT OF ISSUES PRESENTED

**I.**    Plaintiff must establish the existence of a duty of care to state a claim for negligence.  No Michigan court has ever held that individual board members of a health care system owe a duty of care to patients of an affiliated hospital.  Does Michigan law recognize such a duty?

**II**.    The First Amendment bars adjudication of cases that require interpreting religious doctrine.  Ms. Means' claim requires far-reaching interpretation of Catholic policies.  Does the First Amendment bar her claim?

**III.**    Venue is proper only in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. §1391(b)(2).  Based on the convenience of the parties and witnesses, and in the interest of justice, 28 U.S.C. §1404(a) allows "transfer [of] any civil action to any other district or division where it might have been brought."  Ms. Means asserts that venue is proper in the Eastern District of Michigan because certain policies at issue may have been adopted in that district, even though all material witnesses, material records, and plaintiff are located in the Western District of Michigan. Was venue properly transferred to the Western District of Michigan?

Detroit_9831913_3

### STATEMENT OF THE CASE

I.    **MS. MEANS FRAMES HER MEDICAL MALPRACTICE ACTION AS "INDEPENDENT NEGLIGENCE" TO ATTACK CATHOLIC HEALTH CARE.**

On December 1, 2010, plaintiff Tamesha Means sought treatment at Mercy Health Partners (MHP), a hospital in Muskegon, Michigan. Compl. at ¶¶13, 15, R. 1, Page ID #4. She alleges that MHP staff diagnosed her with preterm premature rupture of membrane, but sent her home without informing her of "serious risks to her health if she attempted to continue her pregnancy." *Id.* at ¶¶18, 21, R. 1, Page ID #5. Ms. Means returned to MHP the following day. *Id.* at ¶32, R. 1, Page ID #6. Ms. Means alleges that after further examination MHP physicians suspected she might have chorioamnionitis, but again sent her home. *Id.* at ¶38, R. 1, Page ID #6. That night, Ms. Means returned to MHP where she delivered a premature baby that later died. *Id.* at ¶¶41, 44-45, R. 1, Page ID #7.

Ms. Means' entire case is based upon alleged substandard medical treatment she received at MHP. Nonetheless, she did not sue MHP or her treating physicians for medical malpractice.[1] Instead, she sued the United States Conference of

---

[1] Under Michigan law, medical malpractice claims must be filed within two years of the act or omission giving rise to the action. M.C.L.A. §600.5805(6). Ms. Means' claim accrued on December 2, 2010 and she did not file her complaint until November 29, 2013, after the limitations period for a medical malpractice action had passed.

3

Catholic Bishops (USCCB)[2] along with individuals who served as chairperson of the Catholic Health Ministries (CHM) board between 2000 and 2015. *Id.* at ¶¶6-9, R. 1, Page ID #3. CHM is an unincorporated entity and a public juridic person under canon law.[3] *Id.* at ¶¶ 75, 77, R. 1, Page ID #11. CHM is the Catholic sponsor of Trinity Health,[4] which operates multiple hospitals, including MHP,[5] and is "constituted by competent ecclesiastical authority" to implement Church policy directives for sponsored health care services. 1983 Code c. 116, §1. Trinity, by its bylaws, must "carry out the apostolate of [CHM] on behalf of and as an integral part of the Roman Catholic Church in the United States." Trinity Art. of Inc. at art. II, ¶A, R. 46-16, Page ID #1275.

---

[2] The USCCB is a non-profit civil corporation comprised of Bishops, Archbishops, and Cardinals that advocates and promotes the pastoral teachings of the Roman Catholic Church in areas such as liturgy, doctrine, health care, and social welfare. Aff. of Linda Hunt at ¶16, R. 39-6, Page ID #820.

[3] "In the Church, besides physical persons, there are also juridic persons, that is, subjects in canon law of obligations and rights which correspond to their nature." 1983 Code c.113, §2. "Public juridic persons are the official constitutive parts of the Catholic Church and the primary means through which the Church acts in the world." *Medina v. Catholic Health Initiatives*, No. 13-cv-01249, 2015 WL 8144956, at *4 (D. Colo. Dec. 8, 2015).

[4] As Catholic sponsor, CHM oversees Trinity's Catholic identity. *Id.* at ¶83, R. 1, Page ID #12.

[5] *Id.* at ¶82, R. 1, Page ID #12.

Detroit_9831913_3

## II.    THE USCCB ISSUED DIRECTIVES TO GUIDE CATHOLIC HEALTH CARE SERVICES.

In 2009, the USCCB issued the Fifth Edition of the *Ethical And Religious Directives For Catholic Health Care Services* (the Directives).  Compl. at ¶60, R. 1, Page ID #9.  The Directives "reaffirm the ethical standards of behavior in health care that flow from the Church's teachings about the dignity of the human person" and "provide authoritative guidance on certain moral issues that face Catholic health care today."  USCCB's Directives, at pp. 3-4, R. 42-3, Page ID ##931-932. They express "moral teachings" and are intended to "provid[e] standards and guidance" for Catholic health care services, but "do not cover in detail all of the complex issues that confront Catholic health care today."  *Id.* at p. 4, R. 42-3, Page ID #932.

The Directives are promulgated by Catholic clergy.  Aff. of Linda Hunt, ¶16, R. 39-6, Page ID #820.  Catholic bishops in their respective dioceses then decide how to implement them as standards and guidelines for Catholic health care services within that diocese.  Gen. Decree of the Most Reverend Earl Boyea, Bishop of Lansing, R. 46-23, Page ID #1334.  The Directives express the moral and religious positions of the Catholic Church on a variety of medical issues, including the Church's social mission, pastoral care for patients, organ transplantation, genetic testing, artificial fertilization, abortion, and medically

Detroit_9831913_3

assisted nutrition for patients in a vegetative state.  USCCB's Directives, at pp. 11-12, 15-17, 20, 25, 27, 31, R. 42-3, Page ID ##939-940, 943-945, 948-949, 953, 955, 959.

Four specific Directives are the most relevant to this appeal:

- Directive 5 states that "Catholic health care services must adopt these Directives as policy, require adherence to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction regarding the Directives for administration, medical and nursing staff, and other personnel." *Id.* at p. 12, R. 42-3, Page ID #940.

- Directive 27 states that "[f]ree and informed consent requires that the person or the person's surrogate receive all reasonable information about the essential nature of the proposed treatments and its benefits; its risks, side-effects, consequences, and cost; and any reasonable and morally legitimate alternatives, including no treatment at all." *Id.* at p. 20, R. 42-3, Page ID #948.

- Directive 45 states that "[a]bortion (that is the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted. Every procedure whose sole immediate effect is termination of pregnancy before viability is an abortion, which, in its moral context, includes the interval between conception and implantation of the embryo.  Catholic health care institutions are not to provide abortion services, even based upon the principle of material cooperation.  In this context, Catholic health care institutions need to be concerned about the danger of scandal in any association with abortion providers." *Id.* at p. 26, R. 42-3, Page ID #954.

- Directive 47 states that "[o]perations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant

6

woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child." *Id.*

### III.  THE CASE WAS DISMISSED BECAUSE MS. MEANS FAILED TO STATE A CLAIM AND ALSO BECAUSE THE FIRST AMENDMENT BARRED ADJUDICATION.

Ms. Means filed her complaint in the Eastern District of Michigan.  She claimed that the Individual Defendants were negligent in adopting the Directives as policy for Trinity affiliated hospitals, and thus causing MHP to breach it standard of medical care.  Compl. at ¶¶102-104, 117-118, R. 1, Page ID ##15-17, 18-20. The premise of her claim is that, but for the Directives' prohibition on "direct" abortions, she should have received, or been advised of the option to receive, an abortion when she sought treatment at MHP.  W.D. Mich. Op. at p. 5, R. 54, Page ID #1435; Compl. at ¶¶52-53, R. 1, Page ID #8.  She brought a single negligence claim, not against her health care providers, but against the Individual Defendants,[6] asserting they are personally liable for the acts of CHM in adopting the Directives for Trinity.  Compl. at ¶¶74, 82-87, 117-118, R. 1, Page ID ##11-12, 16-20.

The Individual Defendants moved to change venue to the Western District of Michigan.  CHM Defs.' Mot. to Change Venue, R. 13.  The Eastern District of Michigan granted the motion, finding that venue was improper under 28 U.S.C.

---

[6] The Individual Defendants are only three of CHM's many board members over fifteen years.

7

§1391(b)(2) because Ms. Means did not submit any evidence of events occurring in the Eastern District of Michigan, and that venue should be transferred under §1404(a) because of Ms. Means' apparent forum shopping.   E.D. Mich. Op. at pp. 6-9, R. 31, Page ID ##705-708, 715.  The alleged inadequate treatment, the alleged injury, the witnesses, important documents (most notably medical records), and plaintiff were all located in the Western District.  *Id.* at pp. 9-16, R. 31, Page ID ##708-715.

After the change of venue, the Individual Defendants filed a motion to dismiss.  CHM Defs.' Mot. to Dismiss, R. 39.  The district court granted the motion, finding that Ms. Means' negligence claim failed because the Individual Defendants did not owe her a duty under Michigan law, and also because the First Amendment barred adjudication of her claim.  W.D. Mich. Op., R. 54.

On the threshold issue of duty, the district court noted: "Michigan law recognizes that 'a hospital may be 1) directly liable for malpractice, through claims of negligence in supervision of staff physicians as well as selections and retention of medical staff, or 2) vicariously liable for the negligence of its agents.'"  *Id.* at pp. 18-19, R. 54, Page ID ##1448-1449 (quoting *Cox ex rel. Cox v. Bd. of Hosp. Managers for City of Flint*, 651 N.W.2d 356, 361 (Mich. 2002)).  Ms. Means did not allege the Individual Defendants "are directly liable for negligence in supervision, selection, or retention.  Rather, [she] argues that entities that establish

8

policies governing the delivery of health care owe a duty to patients and may be liable for 'independent negligence,' as distinct from malpractice or vicarious liability." *Id.* at p. 19, R. 54, Page ID #1449.  Her claim failed because she "[did] not demonstrate that [her claim] is supported by precedent, nor sufficiently analogous case law, that would allow [the] Court to determine CHM's duty, where it is a non-incorporated religious organization that sponsors a hospital network for the purpose of instilling its religious identity." *Id.* at p. 20, R. 54, Page #1450.

The district court also dismissed the complaint on First Amendment grounds.  "Even if [Ms. Means] could articulate a cognizable legal duty, the Court could not adjudicate" her claim because she "has not presented a way for this Court or a jury to analyze CHM's duty, breach, or causation without reference to the text of the [Directives], which are an expression of Catholic doctrine."  *Id.* "The application of the Directives are inextricably intertwined with the Catholic Church's religious tenets," and adjudication requires deciding "whether the establishment of the [Directives] constitute negligence." *Id.* at p. 23, R. 54, Page ID #1453.  Therefore, her claim ran afoul of the First Amendment because it "necessarily involves inquiry into the [Directives] themselves, and thus into Church doctrine." *Id.*

Detroit_9831913_3

## STANDARDS OF REVIEW

This Court "reviews *de novo* a district court's dismissal of a plaintiff's complaint for failure to state a claim under Rule 12(b)(6)." *Lukas v. McPeak*, 730 F.3d 635, 637 (6th Cir. 2013). A complaint must "contain either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory." *D'Ambrosio v. Marino.* 747 F.3d 378, 383 (6th Cir. 2014) (internal citations omitted). "In reviewing a motion to dismiss, the Court may consider the complaint and any exhibits attached thereto, public records, items in the record of the case and exhibits attached to defendant's motion so long as they are referred to in the complaint and are central to the claims contained therein." *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 774 (6th Cir. 2015). Also, it "may affirm the district court's dismissal of [p]laintiff['s] claims on any grounds, including those not relied on by the district court." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008).

This Court "review[s] *de novo* the district court's interpretation of the venue statutes and its determination of whether a case is filed in an improper venue." *Kerobo v. Sw. Clean Fuels, Corp.*, 285 F.3d 531, 533 (6th Cir. 2002). A decision to transfer a case under 28 U.S.C. §1404 is reviewed for an abuse of discretion. *Smith v. Aegon Cos. Pension Plan*, 769 F.3d 922, 933 (6th Cir. 2014). "Reversal is warranted when the district court's judgment was undoubtedly mistaken or

Detroit_9831913_3

erroneous, but it is not warranted simply because this Court would have decided the case differently." *Paterek v. Village of Armada*, 801 F.3d 630, 643 (6th Cir. 2015) (internal citations omitted).

## SUMMARY OF ARGUMENT

Michigan law does not recognize any duty of care owed by individual members of a health care system's governing board to patients of an affiliated hospital.  Ms. Means attempts to create such a duty by misapplying medical malpractice case law, despite the fact that the Individual Defendants had no involvement whatsoever in her medical treatment.  The duty of care in medical malpractice cases is based on the relationship hospitals and physicians have with patients, a relationship that is nonexistent here.  The district court was correct in ruling that the Individual Defendants did not owe Ms. Means a duty of care.

Even if a duty were somehow found, the First Amendment bars adjudication of Ms. Means' claim.  No matter how illogical or inconsistent one may consider religious beliefs, courts cannot adjudicate their validity or reasonableness.  Ms. Means' complaint necessarily requires an adjudication of whether the Directives, a statement of Roman Catholic theology, are reasonable policies for Catholic health care institutions.  To do so violates the First Amendment.

Ms. Means' suit is a disguised and time-barred medical malpractice action which attacks Catholic health care providers for following Catholic doctrine.  She

11

mistakenly argues that her claim can be resolved on neutral legal principles. Her claim, however, requires a court to examine (and reject) fundamental tenets of Catholic moral theology. For example, the complaint requires an examination of the authority of the Catholic Church to direct Catholic health care facilities to follow Catholic moral principles. Then, a court must interpret what the Catholic Church meant by prohibiting "direct" abortions and advice on "morally illegitimate" alternatives. This would require grappling with Catholic moral and philosophical principles such as "double effect." This Court should decline the invitation to allow such entanglement in Catholicism and its core moral doctrines.

Finally, venue was properly transferred to the Western District of Michigan. None of the events giving rise to her claim occurred in the Eastern District of Michigan. The alleged injury, vital witnesses, important documents, and Ms. Means herself are in the Western District of Michigan. Ms. Means speculates that the Directives were adopted in the Eastern District of Michigan, but offered no evidence in support. She only argues that because CHM (which is not even a party to this case) is headquartered in that district, the Directives must have been adopted there. This is not enough to establish venue, and venue was properly transferred.

12

## ARGUMENT

### I.    BOARD MEMBERS OF A HEALTH SYSTEM'S CATHOLIC SPONSOR DO NOT OWE A DUTY OF CARE TO PATIENTS OF AN AFFILIATED HOSPITAL.

A negligence claim under Michigan law requires proof that: "(1) the defendant owed a legal duty to the plaintiff, (2) the defendant breached or violated the legal duty, (3) the plaintiff suffered damages, and (4) the breach was a proximate cause of the damages suffered." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (internal citations omitted). "Whether a defendant owes a plaintiff a duty of care is a question of law." *Hill v. Sears, Roebuck & Co.*, 822 N.W.2d 190, 195 (Mich. 2012). The analysis here ends with the first element. Ms. Means cannot establish that the Individual Defendants owed her a duty of care.

### A.    Medical malpractice cases do not establish that the Individual Defendants owed Ms. Means a duty of care.

In Michigan, "as a general rule, there is no duty that obligates one person to protect or aid another." *Hill*, 822 N.W.2d at 196 (internal citations omitted). There is a narrow exception to this general rule "when a person actively engages in certain conduct [arising] from a statute, a contractual relationship, or by operation of the common law." *Id.* Ms. Means does not allege a duty arising from statute or contract. *See* Compl., R. 1. For her claim to survive, she must establish that the Individual Defendants owed her a common law duty.

13

"At common law, the determination of whether a legal duty exists is a question of whether the relationship between the actor and the plaintiff gives rise to any legal obligations on the actor's part **to act** for the benefit of the subsequently injured person." *Hill*, 822 N.W.2d at 196 (internal citations omitted). Certain special relationships, such as "landlord-tenant, proprietor-patron, employer-employee, residential invitor-invitee, psychiatrist-patient, and doctor-patient" create an obligation to act for the benefit of a plaintiff because plaintiff entrusts herself to defendant's care. *Marcelletti v. Bathani*, 500 N.W.2d 124, 129 (Mich. Ct. App. 1993).

There is no recognized special relationship between the Individual Defendants – as board members of CHM – and Ms. Means. It is not alleged that the Individual Defendants ever met Ms. Means or even knew who she was. Lacking this connection, she could not have entrusted her treatment to them. MHP and its staff had full control over her care. *See Murdock v. Higgins,* 527 N.W.2d 1, 3-4 (Mich. Ct. App. 1995) *aff'd*, 559 N.W.2d 639 (Mich. 1997) (finding no duty because plaintiff could not have "entrusted himself to the protection and control of [defendant]," when defendant "did not even know plaintiff"); *see also Downs v. Saperstien Assocs.*, 697 N.W.2d 190, 193 (Mich. Ct. App. 2005) (finding no special relationship because plaintiffs did not "completely turn[] themselves over to [defendant] for all their [ ] protection").

14

The existence of any duty of some board members of a health care system's Catholic sponsor to patients of an affiliated hospital is not, as Ms. Means declares, "well established."[7]   Appellant's Br. at p. 11.   Her cited authority examined medical malpractice actions, but she sued the Individual Defendants for ordinary negligence.   Medical malpractice cases do not support her claim because "[i]n a medical malpractice action, the duty owed by the health professional arises from the health professional's relationship with the patient."   *Roberts v. Salmi*, 866 N.W.2d 460, 466 (Mich. Ct. App. 2014).   Although Ms. Means' entire case is based upon "established" medical malpractice case law, she did not sue a single nurse, doctor, or hospital which provided treatment, and instead sued only far-removed "policymakers."[8]

Ms. Means' theory of duty rests on a footnote in a medical malpractice opinion.   In *Theophelis v. Lansing Gen. Hosp.*, 366 N.W.2d 249, 250 (Mich. Ct.

---

[7] In the "Summary of Argument" section, she calls her theory "well established." Appellant's Br. at p. 11.   In the "Argument" section, it shrinks to a "tacit understanding."  *Id.* at p. 16.

[8] For no apparent reason other than attempting to create diversity jurisdiction, Ms. Means only named three current or former members of CHM's governing board. Compl. at ¶¶7-9, 73-76, R. 1, Page ID ##3, 11.   She did not sue the **actual** policymakers, *i.e.,* CHM and its entire board.   She did not even allege that the Individual Defendants voted in favor of adopting the Directives.   Even if she had, acts a chairperson are not attributable to the entire board.  *See Mount Elliot Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 407-408 (6th Cir. 1999) (finding that comments of one counsel member cannot be imputed to the entire counsel).

Detroit_9831913_3

App. 1985), plaintiffs brought medical malpractice claims against a hospital, three doctors, and a nurse.  Before trial, plaintiffs settled with the nurse and one doctor, and trial proceeded against the hospital and the other two doctors.  *Id at 251*.  The jury returned a verdict against only the hospital.  *Id.*  The hospital appealed, arguing that plaintiffs' release of the settling defendants eliminated its *respondeat superior* liability.  *Id.* at 251-252.  The Michigan Court of Appeals initially affirmed, holding that the settlement did not release the hospital for its "independent and concurrent acts of negligence."  *Id.* at 252.  On rehearing, the court set aside the verdict and remanded to determine vicarious liability because there was insufficient evidence to establish that the hospital committed independent medical malpractice.  *Theophelis v. Lansing Gen. Hosp.*, 384 N.W.2d 823, 825 (Mich. Ct. App. 1986) (on rehearing).

The Michigan Supreme Court considered the issue of whether settlement with other defendants released the hospital from vicarious liability.  *Theophelis v. Lansing Gen. Hosp.*, 424 N.W.2d 478, 481 (Mich. 1988).  The court noted that the complaint contained allegations of "independent negligence on the part of the hospital," but those claims were properly dismissed after rehearing.  *Id.* at 480, 487.  In a footnote, the court stated:

> Our use of the term, "independent negligence," is intended only for the purpose of identifying those claims by plaintiffs which were directed to hospital policies and

Detroit_9831913_3

procedures as opposed to those claims which rested directly upon the negligent acts of Nurse Palmer and Dr. Gilmore and are referred to as "vicarious liability" claims. Obviously, if claims directed to hospital policies and procedures involved acts of directors, officers or agents of the hospital during the scope of corporate activity, any liability of the hospital for such acts would also be "vicarious." *Id.* at 480 n. 3.

Ms. Means mistakenly contends that this footnote established a common law duty "not to adopt policies that would foreseeably result in harm to MHP's patients." Appellant's Br. at p. 17. The footnote identifies the two separate medical malpractice claims against the hospital: one for substandard training and supervision, and the other for vicarious liability for the acts of its agents. If anything, this footnote arguably may have permitted Ms. Means to bring a timely suit against MHP for medical malpractice. The discussion of duty in *Theophelis* was in the context of a medical malpractice lawsuit against a hospital that treated plaintiff. There was a special relationship between the hospital and plaintiff that justified the imposition of a duty. Ms. Means did not even name MHP as a party. This footnote provides no basis for a suit against the Individual Defendants in their capacity as board members of CHM.

In *Cox ex rel. Cox v. Bd. of Hosp. Managers for City of Flint*, 651 N.W.2d 356, 361 (Mich. 2002), the Michigan Supreme Court clarified the *Theophelis* footnote:

Detroit_9831913_3

> A hospital may be 1) directly liable for malpractice
> through claims of negligence in supervision of staff
> physicians as well as selection and retention of medical
> staff, or 2) vicariously liable for negligence of its agents.

In other words, the "independent negligence" language in *Theophelis* is limited to medical malpractice claims against a hospital for negligent supervision or vicarious liability. No Michigan court has ever recognized an "independent negligence" claim against individual board members of the religious sponsor of a health care system.

Ms. Means' only other case applying Michigan law is unpublished and had a similar holding. In *May v. Mercy Mem'l Nursing Ctr.*, 2009 WL 131699 (E.D. Mich. Jan. 20, 2009), plaintiff's estate sued a nursing home for medical malpractice. Plaintiff alleged that the nursing home was "independently negligent" for "failing to train and/or supervise its nursing staff" and "failing to limit access to controlled substances." *Id.* at *8. The court analyzed *Cox* and *Theophelis* and found that plaintiff stated an independent medical malpractice claim against the nursing home for failure to train and supervise staff. *Id.* at *8-9. This case did not involve a sponsor of a health system or the alleged negligence of individual board members.

Michigan law does not impose a duty of care on the Individual Defendants. Although Ms. Means claims to have received substandard medical care at MHP

and, if those claims were true, could have sued MHP for medical malpractice,[9] her claim is for ordinary negligence.  *See* Compl., R. 1.  The duty in medical malpractice claims is well-established.  It is based on the special relationship between health care professionals and patients and the control those professionals have over treatment.  *See Bailey v. Schaaf*, 835 N.W.2d 413, 418-419 (Mich. 2013) ("[O]ur common law imposes a duty of care when a special relationship exists. These special relationships are predicated on an imbalance of control, where one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself").  The Individual Defendants had no such relationship with Ms. Means.

### B.    Ms. Means' non-Michigan authority is neither helpful nor a substitute for controlling Michigan precedent.

The non-Michigan authority cited by Ms. Means likewise does not establish the existence of a duty.  In *Armstrong v. A.I. Dupont Hosp. for Children*, 60 A.3d 414, 415-416, n. 1 (Del. Super. Ct. 2012), plaintiffs brought a medical malpractice action against treating doctors, a hospital, and a foundation that allegedly operated the hospital.  The issue was whether the hospital and foundation could establish a

---

[9] *See Bryant v. Oakpointe Villa Nursing Ctr.*, 684 N.W.2d 864, 871 (Mich. 2004) ("A medical malpractice claim is distinguished [from ordinary negligence] by two defining characteristics. First, medical malpractice can occur only within the course of a professional relationship.  Second, claims of medical malpractice necessarily raise questions involving medical judgment").

19

limitation of liability for hospitals under Delaware law. They could not, so their motion to dismiss was denied. *Id*. at 423. Any such limitation of liability under Delaware law is irrelevant in this case, where Michigan common law controls.

In *Chesser v. LifeCare Mgmt. Servs., LLC*, 356 S.W.3d 613, 629 (Tex. Ct. App. 2011), the Texas Supreme Court affirmed a medical malpractice jury verdict against a hospital and its health care management company. Ms. Means tries to compare that health care management company to CHM. Ms. Means does not allege CHM is a health care management company, and unlike CHM, the management company's by-laws expressly self-imposed the following duty: "[Defendant], a management company [is] 'morally and legally' responsible by virtue of written governing board bylaws for 'outcomes of all service provided to its patients.'" *Id.* at 634 (quoting the management company's bylaws). No such evidence exists here.

Her other cases are also distinguishable. *Carleto v. Shore Mem'l Hosp.*, 350 A.2d 534, 537 (N.J. Super. Ct. Law Div. 1975), denied a motion to dismiss a claim for negligent hiring against a hospital. *Broder v. Corr. Med. Servs., Inc.*, No. 03-75106, 2008 WL 704229 (E.D. Mich. Mar. 14, 2008), was an action under 42 U.S.C. §1983 where the court relied on federal common law to deny a summary judgment motion but also dismissed plaintiff's state law negligence claims.

20

Ms. Means contends that reversal is proper because the district court "fail[ed] to acknowledge the precedential value" of her Michigan cases and did not consider "analogous cases in other jurisdictions." Appellant's Br. at pp. 18-19. The Michigan cases have no precedential value here and the foreign jurisdiction cases are not analogous. The district court recognized this and appropriately dismissed her complaint. W.D. Mich. Op. at p. 20, R. 54, Page ID #1450. This Court should affirm that decision.

## II. THIS ACTION REQUIRES INTERPRETING RELIGIOUS DOCTRINE AND DECIDING WHETHER IT IS REASONABLE HOSPITAL POLICY, THUS IMPLICATING THE FIRST AMENDMENT.

This case should be decided on state law alone. Although the district court dismissed the claim for two reasons, this Court only needs to address one. Ms. Means' brought a camouflaged medical malpractice claim against the wrong parties, asserting a highly attenuated theory of liability. The Individual Defendants had no duty to Ms. Means because, unlike MHP and her treating physicians, the Individual Defendants had no relationship with Ms. Means. This Court does not need to go beyond the state law analysis, but if it does, the district court should also be affirmed on First Amendment grounds.

Ms. Means wants a court do decide whether the Directives, a statement of Roman Catholic theology, are bad hospital policy. Courts cannot decide which religious beliefs are reasonable or appropriate. "[R]eligious beliefs need not be

21

acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981). "It is well established . . . [that] courts should refrain from trolling through a person's or institution's religious beliefs." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion).

The First Amendment guarantees religious organizations "independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952). Consistent with this fundamental rule of law, the district court correctly held that "[i]t is not up to the Court to mandate the larger structural and policy reform to Catholic hospitals that [Ms. Means] seeks; that issue is left to the Church and its tribunals." W. D. Mich. Op. at p. 24, R. 54, Page ID #1454.

"Whether a secular court may hear a tort suit despite the [First Amendment] turns on the availability of secular standards and the ability of a court to resolve the controversy without reference to religious doctrine." *Ogle v. Hocker*, 279 Fed. Appx. 391, 395 (6th Cir. 2008). The Directives are "a statement of the Roman Catholic Church's moral and religious postures as it relates to health care issues." W.D. Mich. Op. at p. 22, R. 54, Page ID #1452. They express Catholic doctrine and are rooted in Catholic theology. *Id.*; *see also Overall v. Ascension*, 23

22

F.Supp.3d 816, 825 (E.D. Mich. 2014) (taking judicial notice of the Directives as religious doctrine).  Therefore, the district court found that any "[i]nterpretation of the [Directives] is an interpretation of Catholic theology," prohibited by the First Amendment.  W.D. Mich. Op. at p. 22, R. 54, Page ID #1452.

Ms. Means' claim begins with Directive 5, which states: "Catholic health care services must adopt these Directives as policy."  USCCB's Directives at p. 12, R. 42-3, Page ID #940.  According to Ms. Means, "Directive 5 required MHP to adhere to all of the Directives."  Compl. at ¶63, R. 1, Page ID #9.  However, the district court recognized that the USCCB has no authority to enforce the Directives.  W.D. Mich. Op. at p. 4, R. 54, Page ID #1434.  Instead, "[i]ndividual bishops exercise authority under [c]anon law to bind all Catholic health care institutions located within their diocese" to the Directives.  *Id.*  To decide the threshold issue of duty, a court must necessarily examine the authority of a local bishop to bind MHP to the Directives.[10]  This is a strictly ecclesiastic undertaking.

Ms. Means then points to Directive 27.  It states that patients should "receive all reasonable information about the essential nature of the proposed treatment," including "any reasonable and morally legitimate alternatives."  USCCB's

---

[10] Under Michigan law, control is the central factor in finding a duty of care.  *See Bailey*, 835 N.W.2d at 418-419.  To analyze duty, a court must examine the control that the local bishop exercised over MHP.

23

Directives at p. 20, R. 42-3, Page ID #948.  Ms. Means argues that Directive 27, by excluding morally "illegitimate" alternatives, prevented MHP from advising her of the option of an abortion, and at its core, Directive 27 is an "unreasonable" hospital policy.  To adjudicate this issue, a court must determine what the Catholic Church intended by "morally legitimate" alternatives.

Ms. Means argues that abortions are never "morally legitimate" under Catholic doctrine because Directive 45 states that "direct" abortions are "never permitted."  *Id.* at p. 26, R. 42-3, Page ID #954.  Directive 47, however, allows procedures to cure a "proportionately serious pathological condition of a pregnant woman . . . even if they will result in the death of the unborn child."  *Id.*  Religious scholars describe the distinction between prohibiting "direct" abortions (Directive 45) and allowing "indirect" abortions (Directive 47) as codifying the Catholic principle of "double effect."[11]  *See* Edward A. Hartnett, Catholic Judges and Cooperation in Sin, 4 U. St. Thomas L.J. 221, 240 (Fall 2006).  Ms. Means' complaint seeks examination of "double effect" at MHP, specifically, whether her

---

[11]  "'Double effect' provides the criteria by which to evaluate the permissibility of undertaking an act that has an evil effect."  Hartnett, *supra* at p. 24, 238-239.  There are four elements: (1) the act itself must be good or morally indifferent, (2) the good effect must follow from the evil effect, (3) the intent must be directed toward the good effect, and (4) there must be a sufficient reason for permitting the evil.  *Id.* at 239.  "At the heart of the doctrine is the difference between intending evil and accepting evil."  *Id.*

Detroit_9831913_3

alleged injury was a "proportionately serious pathological condition" as defined by religious doctrine to permit an "indirect" abortion as a "morally legitimate" alternative.[12]

The First Amendment issues presented by this lawsuit are not limited to interpreting Catholic doctrine. Ms. Means argues that the "legal analysis would be the same" if the Individual Defendants adopted these policies for secular reasons. Appellant's Br. at p. 27. However, she bypassed medical malpractice claims and instead sued religious persons based on Catholic beliefs. Consequently, Catholic doctrine will be on trial.

Ms. Means wants to strip a religious entity of its theological and moral beliefs. She even declares that the Directives "are not scripture" and do not deserve protection. Appellant's Br. at p. 26. Examining the relative "importance" of the Directives itself implicates the First Amendment. Any inquiry into their importance would require adjudication of whether the Directives express core beliefs of Catholicism.[13]

---

[12] Ms. Means does not shy away from this fact. In her papers, she attached a USCCB "Committee on Doctrine" ethics opinion on the difference between "direct" and "indirect" abortions. USCCB's Clarification of its Directives re: Abortion, R. 46-3, Page ID ##1133-1136. Her request to review this ethics opinion further underscores her objective of seeking judicial inquiry into religious doctrine.

[13] "Since the first century the Church has affirmed the moral evil of every procured abortion. This teaching has not changed and remains unchangeable. Direct

25

"[I]t is easy to see that [i]f the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization . . . may, and must, be examined into with minuteness and care," and "[t]his principle would deprive these bodies of the right of construing their own church laws." *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 714 (1976). This sort of far reaching adjudication requested by Ms. Means would constitute "government interference with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, __ U.S. __, 132 S.Ct. 694, 707 (2012). "The very process of inquiry leading to findings and conclusions" implicates Catholicism and violates the First Amendment. *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979).

Ms. Means' authorities regarding application of "neutral principles" involved issues that, unlike here, did not require examination of religious doctrine.[14] In *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d

---

abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law." Catechism of the Catholic Church, art. 5, §2271; http://www.vatican.va/archive/ccc_css/archive/catechism/p3s2c2a5.htm.

[14] "The neutral principles approach . . . obviates entirely the need for an analysis or examination of ecclesiastical polity or doctrine." *Jones v. Wolf*, 443 U.S. 595, 605 (1979). As discussed, Ms. Means' claim requires examining religious doctrine, an inquiry not tolerated by the First Amendment.

Detroit_9831913_3

409 (2d Cir. 1999), a Catholic diocese appealed a jury verdict finding it liable for breach of fiduciary duties in a case involving sexual misconduct by a priest. The diocese argued that the court was barred from finding a fiduciary duty based upon religious doctrine and practices. *Id.* at 430. The court, however, held that "the jury's finding of a fiduciary duty was supported by ample evidence apart from the evidence of religious nature," and that its decision was not "for or against any religious doctrine or practice." *Id.* at 430-431. In contrast, Ms. Means argues that religious policies themselves are wrong and adjudication requires delving into Catholic doctrine.

Ms. Means' other authorities are also misplaced. *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 408 (6th Cir. 2010), dealt with trademarks, not religious doctrines. ("Plainly, the case can be resolved using the neutral principles of trademark law"). Similarly, *Malicki v. Doe*, 814 So.2d 347, 361 (Fla. 2002), presented issues of negligent hiring and supervision unrelated to church doctrine. ("[T]he Free Exercise Clause is not implicated in this case because [of] the conduct sought to be regulated; that is, the Church Defendants' alleged negligence in hiring and supervision is not rooted in religious belief").[15]

---

[15] Ms. Means misapplies the dictum in *Gen. Council on Fin. & Admin. of the United Methodist Church v. Super. Ct. of Cla.*, 439 U.S. 1355, 1372 (1978), as limiting the First Amendment to "internal, religious disputes." Appellant's Br. at p. 25. Actually, the court stated that "[First Amendment] considerations are not

Detroit_9831913_3

This Court's analysis of *Ogle v. Church of God* and *Ogle v. Hocker* demonstrates why Ms. Means' claims cannot be decided on neutral principles of law.  In *Ogle v. Church of God*, 153 Fed. Appx. 371 (2005), plaintiff, a bishop in the Church of God, attended a conference with Mr. Hocker, a church pastor.  After Mr. Hocker informed the church that plaintiff made sexual advances toward him, plaintiff was found guilty by the church to have engaged in "unbecoming ministerial conduct" and suspended.  *Id.* at 373.  He sued the church, but his claim was dismissed because it required interpretation of church doctrine, *i.e.,* church disciplinary procedures.  *Id.* at 376.   Plaintiff then filed a defamation suit against Mr. Hocker.  *See Ogle v. Hocker*, 279 Fed. Appx. at 393.  That action did not violate the First Amendment because it did not require "delv[ing] into protected matters of church doctrine, policy, and practice."  *Id.* at 396.

*Ogle v. Church of God* required analysis of religious doctrine, while *Ogle v. Hocker* could be decided without reference to religious doctrine.  Although some

---

applicable **in purely secular disputes** . . . in which fraud, breach of contract, and statutory violations are alleged."  *Super. Ct. of Cla.*, 439 U.S. at 1373 (emphasis added).  This is not a purely secular suit in which fraud, breach of contract, and statutory violations are alleged.  It is a negligence suit alleging that religious doctrine is unreasonable policy.  *See Bryce v. Episcopal Church in Diocese of Colo.*, 121 F.Supp.2d 1327, 1344 (D. Colo. 2000); *see also Bible Way Church of Our Lord Jesus Christ of Apostolic Faith of Wash. D.C. v. Beards*, 680 A.2d 419, 427 (D.C. Cir. 1996) ("Civil courts must be careful not to violate the First Amendment by agreeing to resolve a controversy which, at its heart, concerns religious doctrine and practice").

Detroit_9831913_3

of Hocker's allegedly defamatory statements were made during a church service, he "repeated the allegations, along with others, on numerous other occasions after the sermon, thus taking the bulk of his comments outside of the religious practice context." *Id.* Further, "the sermon statements themselves were not related to . . . polity issues," and "neither party [ ] pointed to any doctrinal issues that will be involved." *Id.* "Most importantly, [ ] Hocker does not claim that defamation is a practice of his church or is otherwise rooted in religious belief." *Id.* Here, the Directives embody religious doctrine deeply rooted in Catholicism.[16]

Ms. Means' final arguments have no merit. She contends that the district court violated the Establishment Clause by refusing to interpret the Directives.

---

[16] Ms. Means tries to analogize CHM to Christian Science faith healers found liable in *Lundman v. McKown*, 530 N.W.2d 807 (Minn. Ct. App. 1995). But CHM is more like the church entity that was not found liable because it had no control over specific patient care and merely expressed core religious tenets. In *Lundman*, plaintiff sued faith healers and the First Church of Christ, Scientist for substandard treatment based on religious directives. *Id.* at 815. The faith healers owed a duty to plaintiff because they had "significant custody or control" over plaintiff's care and "accepted responsibility to care for [him] and to protect him by providing professional services in return for cash wages." *Id.* at 821-823. The church entity, however, owed no duty. "There simply was no evidence that the church had a right to **control** the means and manner of [the faith healers'] performances . . . beyond their acceptance of the religious doctrine espoused by the church." *Id.* at 825. "To rule otherwise would make too much of the consequences of the church's adherence to and promotion of its core tenet." *Id.* "[T]he constitutional right to religious freedom includes the authority of churches – not courts – to independently decide matters of faith and doctrine, and for a church as an institution to believe and speak what it will." *Id.* at 826.

Detroit_9831913_3

Appellant's Br. at p. 31. But Ms. Means "fails to distinguish between action taken to preserve the government's neutrality in the face of religious differences and action which affirmatively prefers one religion over another." *Chrisman v. Sisters of St. Joseph of Peace*, 506 F.2d 308, 311 (9th Cir. 1974). Here, the district court remained neutral and did not advance Catholicism. Additionally, she states that the public is "without recourse" if the district court's decision stands. Appellant's Br. at p. 31. To the contrary, as the district court noted, persons harmed at a Catholic hospital have recourse through medical malpractice claims. W.D. Mich. Op. at pp. 23-24, R. 54, Page ID #1453-1454.

Ms. Means is not asking a court to determine negligence based upon the acts of health care professionals. Nor is she asking a court to decide liability for a secular board of directors. She wants a court to decide whether it is reasonable for a Catholic hospital to follow Catholic doctrine. The First Amendment prohibits courts from "determin[ing] matters at the very core of a religion – the interpretation of particular church doctrines and the importance of those doctrines to the religion." *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449-450 (1969). The dismissal of Ms. Means' complaint should be affirmed.

Detroit_9831913_3

### III.    VENUE IS PROPER IN THE WESTERN DISTRICT OF MICHIGAN.

#### A.    Ms. Means failed to establish venue under 28 U.S.C. §1391(b)(2).

To assert venue under 28 U.S.C. §1391(b)(2), Ms. Means must establish that the Eastern District of Michigan is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." *See Anonymous v. Kaye*, 104 F.3d 355 (2d Cir. 1996) ("[T]he plaintiff has the burden of establishing that it has chosen the proper venue"); *see also Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979) ("Plaintiff had the burden of showing that venue was properly laid").  "If [she] does, venue is proper, if [she] does not, venue is improper, and the case must be dismissed or transferred under §1406(a)." *Atlantic Marine Const. Co. Inc. v. U.S. Dist. Ct. for W. Dist. Of Tx.*,__ U.S. __, 134 S.Ct. 568, 577 (2013).  The Eastern District of Michigan found venue improper, holding that Ms. Means could not meet that burden.  E.D. Mich. Op. at p. 9, R. 31, Page ID #708.

Ms. Means argues that the trial court erred by not accepting her conclusory statement that the Directives were adopted by CHM in the Eastern District of Michigan.  This is the sole "event" alleged to have occurred in that district.  *See* Compl., R. 1.  She contends that the Court must accept this statement because it was not contested by defendants' affidavits.  Appellant's Br. at pp. 48-49.  But her

31

cited cases analyze dispositive motions, not venue motions. And, even if her statement was supported by the record, it does not alone establish venue. Ms. Means alleges that non-party CHM, not the Individual Defendants, adopted the Directives in the Eastern District. Compl. at ¶¶11, 74, R. 1, Page ID ##4, 11. In fact, there is no allegation that any individual defendant ever stepped foot in the state of Michigan, let alone in the Eastern District.

She also argues that, because CHM was located in Novi or Livonia, it must presumably have adopted the Directives in the Eastern District of Michigan. Appellant's Br. at p. 50. That conclusory assertion cannot be and should not be accepted as evidence to establish venue.

When challenged, plaintiff must present "evidence to show that a[ ] substantial event[ ], within the meaning of venue law, took place in that district." *Doe v. Klein*, 254 Fed. Appx. 626, 629 (9th Cir. 2007); *see Woodke v. Dahm*, 70 F.3d 983, 985-986 (8th Cir. 1995). There is no evidence that the Individual Defendants actually adopted the Directives in the Eastern District of Michigan. There is only evidence that CHM (a non-party) was located in the Eastern District.

Other than the alleged adoption of the Directives by CHM, all other events giving rise to her claim occurred outside the Eastern District. The Directives were published in Washington D.C. Compl. at ¶60, R. 1, Page ID #9. The alleged duty arose when Ms. Means was a patient at MHP in the Western District (Muskegon,

Detroit_9831913_3

Michigan). *Id.* at ¶¶14-15, R. 1, Page ID #4. And, the purported breach of proper medical care and injury occurred when she received treatment at MHP. *Id.*; *see Myers v. Bennet Law Offices*, 238 F.3d 1068, 1076 (9th Cir. 2001) (finding venue proper in a tort action where "at least one of the 'harms' suffered" occurred). For all these reasons, the order for change of venue should be affirmed.

### B. The district court did not abuse its discretion in transferring venue under 28 U.S.C. §1404(a).

The Eastern District of Michigan also held that venue should be transferred under 28 U.S.C. §1404(a). "The statute's literal language requires that the transfer would serve the convenience of the parties and witnesses, that the transfer would serve the interest of justice, and that the transferred action could have been brought in the transferee court." *Bunting ex. rel. Gray v. Gray*, 2 Fed. Appx. 443, 448 (6th Cir. 2001). The district court found that the convenience of the witnesses, the location of relevant documents, the location of relevant facts, the ability to compel attendance of unwilling witnesses, the choice of forum, efficiency of trial, and the interests of justice supported transfer to the Western District of Michigan. E.D. Mich. Op. at pp. 9-16, R. 31, Page ID ##708-715.

As her only argument, Ms. Means contends that the district court abused its discretion by applying the wrong legal standard and placing the burden on her to defend her chosen venue. In fact, the district court repeated six times in its

Detroit_9831913_3

opinion that plaintiff's choice of venue deserves deference and defendants must overcome this burden. *Id.* at pp. 10-11, 13, 15-17, R. 31, Page ID ##709-710, 712, 714-716. The district court analyzed the applicable factors and found that "[d]efendants have carried the burden of demonstrating that venue should be transferred." *Id.* at p. 17, R. 31, Page ID #716. Apparently, Ms. Means is confused by the district court affording "less weight" to her choice of forum because she does not reside in the Eastern District. *Id.* at p. 15, R. 31, Page ID #714. Applying that principle was not an abuse of discretion but in conformance with well established case law. *See In re Link_A_Media Devices Corp.*, 662 F.3d 1221, 1224 (Fed. Cir. 2011) ("When a plaintiff brings its charges in a venue that is not its home forum, however, that choice of forum is entitled to less deference").

The district court did not abuse its discretion. According to Ms. Means, the district court accepted the Individual Defendants' "unsubstantiated claims" about the location of witnesses, documents, and operative facts. Actually, the district court reviewed the record and, where Ms. Means failed to identify specific witnesses or documents, adopted a common sense ruling on where the witnesses and documents are located. As one example, Ms. Means failed to name a single witness who resides in the Eastern District of Michigan. E.D. Mich. Op. at p. 11, R. 31, Page ID #710. The district court noted this and held that "it seems that MHP personnel who treated [Ms. Means] and allegedly carried out the Directives,

34

in the Western District, would be needed to establish a cause of action." *Id.* at p. 12, R. 31, Page ID #711.

The district court did not abuse its discretion because all factors support the transfer to the Western District of Michigan. Other than Ms. Means' expert, all foreseeable witnesses (the Individual Defendants, members of the USCCB, her treating physicians, etc.) are either out-of-state or located in the Western District of Michigan. E.D. Mich. Venue H'rg Tr. at pp. 20-22, R. 32, Page ID ##737-738 (Ms. Means' counsel listing potential witnesses). "The convenience of expert witnesses," however, "is accorded little or no significance." *Adler v. Avis Rent-A-Car Sys., Inc.*, 391 F.Supp. 466, 470 n. 1 (E.D. Wisc. 1975); *see In re Ralston Purina Co.*, 726 F.2d 1002, 1006 n. 6 (4th Cir. 1984). Further, facts needed to prove duty, breach, causation, and injury are all located at MHP. Compl. at ¶¶13-14, 43, R. 1, Page ID ##4, 7. Witnesses necessary to prove those facts are in the Western District and outside the Eastern District's subpoena power. E.D. Mich. Op. at pp. 14-15, R. 31, Page ID ##713-714. Finally, interests of justice support transfer because of Ms. Means' forum shopping. She bypassed her home district for no legitimate reason and the Western District has a significant interest in hearing a tort claim involving events at a local hospital. *See Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 92 F.Supp.2d 51, 54 (D. D.C. 2013) ("Under the

Detroit_9831913_3

'interest of justice' factor, courts consider * * * the local interest in deciding local controversies at home").

## <span style="font-variant: small-caps">Conclusion</span>

The Western District of Michigan should be affirmed because Michigan does not recognize a duty of care for a select few individual board members of a health care system to patients of affiliated hospitals.  It should also be affirmed because the First Amendment prohibits judicial interpretation of religious doctrine, and Ms. Means' claim requires far reaching interpretation of Catholic doctrine. Finally, the Eastern District of Michigan should be affirmed because the Western District of Michigan was the proper venue.

Respectfully submitted,

BODMAN PLC

By:    /s/ Dennis J. Levasseur
      Dennis J. Levasseur (P39778)
      Thomas Van Dusen (P30602)
      Michael J. Serra (P77741)
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
dlevasseur@bodmanlaw.com
tvandusen@bodmanlaw.com
mserra@bodmanlaw.com

Dated: March 17, 2016      313.259.7777
Detroit, Michigan      Counsel for Stanley Urban, Robert
      Ladenburger, and Mary Mollison

36

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the word counting feature of counsel's word processing program shows that this brief contains 7,633 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

By:    /s/ Dennis J. Levasseur

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2016, I electronically filed the foregoing document through the court's electronic filing system, and that it has been served on all counsel of record through the court's electronic filing system.

By:    /s/ Dennis J. Levasseur

Detroit_9831913_3

### DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

**E.D. Mich. Case No. 13-cv-14916**
**W.D. Mich. Case No. 15-cv-00353**

| Record Entry | Description | Page ID Range |
|---|---|---|
| 1 | Compl. | 1-22 |
| 13 | CHM Defs.' Mot. to Change Venue | 48-63 |
| 17 | USCCB's Mot. to Dismiss for Improper Venue | 73-86 |
| 22 | Pl.'s Br. in Opposition to CHM Defs.' Mot. to Change Venue | 195-221 |
| 22-1 | Index of Exs. | 222 |
| 22-3 | CHM's Bylaws | 228-236 |
| 22-5 | Article Listing CHM's Location in the Eastern District of Michigan | 240-246 |
| 23 | USCCB's Mot. to Dismiss | 247-275 |
| 25 | CHM Defs.' Reply Br. on Mot. to Change Venue | 365-373 |
| 31 | E.D. Mich. Op. | 700-716 |
| 32 | E.D. Mich. Venue H'rg Tr. | 717-761 |
| 39 | USCCB's Mot. to Dismiss | 755-784 |
| 39-5 | USCCB Notice of Special Appearance | 807-815 |
| 42 | CHM Defs.' Mot. to Dismiss | 875-903 |
| 42-3 | USCCB's Directives | 928-971 |

Detroit_9831913_3

| 46 | Pl.'s Opp'n to USCCB Mot. to Dismiss | 1053-1084 |
|---|---|---|
| 46-1 | Index of Exs. | 1085-1087 |
| 46-2 | USCCB's Ethical and Religious Directives for Catholic Health Care Services | 1088-1131 |
| 46-3 | USCCB's Clarification of its Directives re: Abortion | 1132-1136 |
| 46-4 | USCCB's News Statement re: Abortion Clarification | 1137-1143 |
| 46-5 | USCCB's Consolidated Financial Statements | 1144-1155 |
| 46-11 | USCCB's IRS Tax Exempt Ruling | 1202-1230 |
| 46-12 | Official Catholic Directory | 1231-1234 |
| 46-13 | USCCB Committee on Doctrine Members | 1235-1239 |
| 46-16 | Trinity Art. Of Inc. | 1275-1281 |
| 46-17 | List of Trinity Health's Michigan Hospitals Brochure re: USCCB Training on Directives in Michigan | 1282-1284 |
| 46-23 | Gen. Decree of the Most Referend Earl Boyea, Bishop of Lansing | 1330-1332 |
| 47 | USCCB's Reply on Mot. to Dismiss | 1337-1348 |
| 48 | Pl.'s Opp'n to CHM Defs' Mot. To Dismiss | 1354-1383 |
| 50 | CHM Defs.' Reply on Mot. to Dismiss | 1406-1420 |
| 54 | W.D. Mich. Op. | 1431-1454 |
| 57 | Notice of Appeal | 1457 |

Detroit_9831913_3