Case No. 15-1779

United States Court of Appeals for the Sixth Circuit

---

TAMESHA MEANS,

Plaintiff-Appellant,

v.

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS, a not-for-profit
corporation; STANLEY URBAN; ROBERT LADENBURGER;
and MARY MOLLISON,

Defendants-Appellees.

---

On Appeal from the
United States District Court for the Western District of Michigan

---

## APPELLANT'S REPLY BRIEF

Brigitte Amiri
Alexa Kolbi-Molinas
Louise Melling
Jennifer Dalven
Alyson Zureick
American Civil Liberties Union
    Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2633
bamiri@aclu.org

Brooke A. Merriweather-Tucker
Daniel S. Korobkin
Michael J. Steinberg
Kary L. Moss
American Civil Liberties Union
    Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6823
btucker@aclumich.org

Don Ferris
Cooperating Attorney,
American Civil Liberties Union
    Fund of Michigan
Ferris & Salter, P.C.
4158 Washtenaw Ave.
Ann Arbor, MI 48108
(734) 677-2020

*Attorneys for Plaintiff-Appellant Tamesha Means*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………...iii

INTRODUCTION ...................................................................................1

ARGUMENT ........................................................................................2

I.     Ms. Means Properly Pled a Negligence Claim Against the CHM Defendants. ...................................................................................2

     A.     Michigan Recognizes Negligence Liability Against Hospital Policymakers. .................................................................3

     B.     Multiple Jurisdictions Recognize Negligence Claims Arising out of Hospital Policies Against Entities Other than Hospitals. ......................6

     C.     The Special Relationship Test Does Not Apply to Claims Arising Out of the Defendants' Own Negligent Acts. ................................................8

II.     The First Amendment Does Not Bar Ms. Means's Claim. ..........................11

III.     USCCB is Subject to Personal Jurisdiction in Michigan. ............................20

     A.     USCCB Waived its Personal Jurisdiction Defense.............................20

     B.     USCCB is Subject to Jurisdiction for Claims Arising out of the Policies that it Purposefully Directed Towards Michigan.................................21

IV.     The District Court Erred in Granting Defendants' Motion to Change Venue... .. ...................................................................................26

CONCLUSION ...................................................................................28

CERTIFICATE OF COMPLIANCE.......................................................30

CERTIFICATE OF SERVICE .............................................................30

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Air Prods. & Controls, Inc. v. Safetech Int'l Inc.*, 503 F.3d 544 (6th Cir. 2007)....22

*Armstrong v. A.I. Dupont Hospital for Children*, 60 A.3d 414 (Del. Super. Ct. 2012) ...................................................................................................7

*Bailey v. Schaaf*, 835 N.W.2d 413 (Mich. 2013)....................................................10

*Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499 (6th Cir. 2014)... 24, 25

*Burger King Corporation v. Rudzewicz*, 471 U.S. 462 (1985)...............................25

*Chesser v. LifeCare Management Services., L.L.C.*, 356 S.W.3d 613 (Tex. Ct. App. 2011) ........................................................................................................7

*Corleto v. Shore Memorial Hospital*, 350 A.2d 534 (N.J. Super. Ct. Law Div. 1975) ........................................................................................................7

*Cox ex rel. Cox v. Bd. Of Hosp. Managers for City of Flint*, 651 N.W.2d 356 (Mich. 2002) ...............................................................................................3, 5

*Cutter v. Wilkinson*, 544 U.S. 709 (2005).............................................................19

*Downs v.  Saperstein Associates Corp.*, 697 N.W.2d 190 (Mich. Ct. App. 2005)..10

*Est. of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985) ...........................................19

*First of Mich. Corp. v. Bramlet*, 141 F.3d 260 (6th Cir. 1998) ..............................28

*Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126 (6th Cir. 1995)..........6

*Gen. Council on Fin. & Admin. of the United Methodist Church v. Super. Ct. of Cal.*, 439 U.S. 1355  (1978)................................................................................12

*General Conference Corporation of Seventh-Day Adventists v. McGill*, 617 F.3d 402 (6th Cir. 2010)...............................................................................15

*Gerber v. Riordan*, 649 F.3d 514 (6th Cir. 2011) ..................................................20

*Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353 (2d Cir. 2005) *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004) ...............................................................27

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 132 S. Ct. 694 (2012) ................................................................................................18

*Jones v. Wolf*, 443 U.S. 595 (1979) ........................................................... 14, 15, 18

*Kuznar v. Rashka Corp.*, 750 N.W.2d 121 (Mich. 2008) .........................................5

*Lundman v. McKown*, 530 N.W.2d 807 (Minn. 1995) .............................................19

*Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244 (9th Cir. 1999) ...........................................................................................16

*Malicki v. Doe*, 814 So.2d 347 (Fla. 2002) .............................................................19

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999) ...........................................................................................18

*May v. Mercy Mem'l Nursing Ctr.*, No. 280174, 2009 WL 131699 (Mich. Ct. App. 2009) ...........................................................................................5

*McKelvey v. Pierce*, 800 A.2d 840 (N.J. 2002) .......................................................19

*Melick v. William Beaumont Hosp.*, No. 319495, 2015 WL 1739980 (Mich. Ct. App., Apr. 16, 2015) ...................................................................3

*Mitrano v. Hawes*, 377 F.3d 402 (4th Cir. 2004) .....................................................27

*Murdock v. Higgins*, 527 N.W.2d (Mich. Ct. App. 1995) .......................................10

*Myers v. Am. Dental Ass'n*, 695 F.2d 716 (3d Cir. 1982) .......................................20

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102 (2d Cir. 2010) ...........................................................................................28

*Ogle v. Hocker*, 279 Fed. App'x 391 (6th Cir. 2008) ...................................... 16, 17

*Palmer v. Braun*, 376 F.3d 1254 (11th Cir. 2004)....................................................20

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440 (1969)...........................................................12

*Reese v. CNH Am., LLC*, 574 F.3d 315 (6th Cir. 2009) ..........................................28

*Roberts v. Saimi*, 866 N.W.2d 460 (Mich. Ct. App. 2014)........................................9

*Rupert v. Daggett*, 695 F.3d 417 (6th Cir. 2012)......................................................8

*Schneider v. Hardesty*, 669 F.3d 693 (6th Cir. 2012)........................... 23, 24, 25, 26

*Serbian Eastern Orthodox Diocese for the U.S. and Canada v. Milivojevich*, 426 U.S. 696 (1976)....................................................................................................12

*Southern Machine Co. v. Mohasco Industries*, 401 F.2d 374 (6th Cir. 1968) ........24

*Stiver v. Parker*, 975 F.2d 261 (6th Cir. 1992) ......................................................10

*Taubman Co. v. Webfeats*, 319 F.3d 770 (6th Cir. 2003)................................. 20, 21

*Theophelis v. Lansing Gen. Hospital*, 424 N.W.2d 478 (Mich. 1988)............. 3, 4, 5

*Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38 (1st Cir. 2001) ........................28

Statutes

M.C.L. §600.5838a ...................................................................................................5

M.C.L. §600.2051 .....................................................................................................6

## INTRODUCTION

Religious belief has never been allowed to justify committing harmful acts on another in this country.  Although an individual's right to believe, or not believe, has virtually unlimited protection in America, the freedom to act on those beliefs is more circumscribed.  To ensure that everyone can be safe and secure in their person, regardless of their belief, our legal system dictates that no one is allowed to harm another person, without their consent.  When a person does so, they may not invoke religion to escape liability.  Thus, an individual may not assault their spouse and avoid conviction by claiming their religion allows it.  Nor may a hospital refuse to sterilize its equipment or deny patients necessary blood transfusions, simply by declaring that such acts are required by a religious principle.  The same is no less true here.

Contrary to Defendants' arguments, this case is not a judicial referendum on the wisdom of Catholic doctrine that implicates the First Amendment.  This case is about the harm that Defendants caused Ms. Means by creating mandatory hospital policies that prevented her from receiving proper emergency care for her miscarriage.  It is a negligence action arising from Defendants' healthcare policymaking -- a secular *act* governed by secular law.

As Ms. Means has alleged, when the hospital was asked why it refused to treat her, an administrator explained the staff's actions were required by hospital

1

policy, specifically the Ethical and Religious Directives for Catholic Health Care Services ("Directives").  Compl. ¶¶ 57, 95, R.1, Page ID#8.  Consistent with plaintiffs in other medical negligence cases, Ms. Means sued those responsible for drafting and implementing that mandatory policy -- Defendant United States Conference of Catholic Bishops ("USCCB") and Defendants Stanley Urban, Robert Ladenburger, and Mary Mollison ("CHM Defendants"), respectively -- in the forum and venue where the policy was implemented.  As outlined in her opening brief and below, Ms. Means has provided conclusive case support for this claim.

## **ARGUMENT**

### I.    **Ms. Means Properly Pled a Negligence Claim Against the CHM Defendants.**

There can be no dispute at this stage of the proceedings, where Ms. Means's allegations must be accepted as true, that the CHM Defendants are responsible for implementing policy for Ms. Means's hospital.  Compl. ¶ 95, R. 1, Page ID # 14. The CHM Defendants have, in fact, repeatedly admitted that they implemented the Directives at this hospital.  CHM Defs.' Appellee Br. 13; CHM Defs' Reply Br., R. 50, Page ID # 1146.  Based on case law from Michigan and other jurisdictions, this policymaking responsibility renders them liable for the harm their policy caused Ms. Means.

2

A.     Michigan Recognizes Negligence Liability Against Hospital
       Policymakers.

The CHM Defendants acknowledge there is clear Michigan Supreme Court

precedent for a tort claim based on hospital policies and negligent supervision of

staff.[1]  *See* CHM Defs.' Appellee Br. 18; *see also Theophelis v. Lansing Gen.*

*Hospital*, 424 N.W.2d 478, 480 n.330 (Mich. 1988); *Cox ex rel. Cox v. Bd. Of*

*Hosp. Managers for City of Flint*, 651 N.W.2d 356, 361 (Mich. 2002); Appellant's

Br. 25-28.  The CHM Defendants' attempts to distinguish or limit this precedent to

its facts are unavailing.

In *Theophelis*, the Michigan Supreme Court explained that a hospital may be

held directly liable for its own independent acts of negligence, as well as

vicariously liable for the negligent acts of third parties:

> Our use of the term, "independent negligence," is intended only for the
> purpose of indentifying (sic) those claims by plaintiffs which were directed
> to hospital policies and procedures as opposed to those claims which rested
> directly upon the negligent acts of [medical staff] and are referred to as
> "vicarious liability" claims.
>
> Obviously, if claims directed to hospital policies and procedures involved
> acts of directors, officers or agents of the hospital during the scope of
> corporate activity, any liability of the hospital for such acts would also be

---

[1] S*ee Melick v. William Beaumont Hosp.*, No. 319495, 2015 WL 1739980, at *4
(Mich. Ct. App., Apr. 16, 2015) (explaining that evidence of a hospital's internal
policies is relevant to a direct claim of negligent supervision against the hospital).

"vicarious."  Plaintiffs did not name the particular officers or agents of the hospital in their complaint.

424 N.W.2d at 480 n.3 (internal citations omitted).

These statements highlight several key points relevant to this case:

- **<u>First</u>**, the Michigan Supreme Court recognized that an independent negligence cause of action "directed to hospital policies and procedures" exists.  This is the claim that Ms. Means has raised here.  Compl. ¶¶ 115-117, R.1, Page ID #18.

- **<u>Second</u>**, the court acknowledged that hospital policymaking can involve entities other than the hospital itself, such as "directors, officers or agents." In this case, Ms. Means alleges that other entities, including the CHM Defendants, were directly involved in hospital policymaking.  *Id.*

- **<u>Third</u>**, by explaining that a hospital can be held *vicariously* liable for the harm caused by external policymakers (*e.g.,* "directors, officers or agents of the hospital"), the court necessarily recognized that those external policymakers themselves can be held *directly* liable for the harm caused by that policy.  *Theophelis,* 424 N.W.2d at 491 (holding that plaintiffs could not pursue vicarious liability claim against hospital policies once they dropped direct liability claims against hospital staff).  It is an axiomatic principle of tort law that there can be no vicarious liability in the absence of direct liability for those same acts.  Thus, the court also pointed out that a

4

plaintiff has the option of naming the external officers or agents involved in hospital policymaking as defendants in her complaint, *id.* at 480 n.3, which is precisely what Ms. Means did here.  Compl. ¶¶ 115-117, R.1, Page ID #18.

As Ms. Means already set forth in her opening brief, Appellant Br. 26-27, the principles set forth in *Theophelis* have been affirmed by Michigan's appellate courts.  *See Cox*, 651 N.W.2d at 361[2]; *May v. Mercy Mem'l Nursing Ctr.*, No. 280174, 2009 WL 131699, at *8 (Mich. Ct. App. 2009).

In their brief, the CHM Defendants attempt to avoid this binding precedent by arguing that direct negligence claims against hospital policymakers can be raised only as medical malpractice.  CHM Defs.' Appellee Br. 15-18.  Yet there is simply no basis in these (or any other) cases for such a limitation.  In fact, the opposite is true.  For example, in *Kuznar v. Rashka Corp.*, 750 N.W.2d 121 (Mich. 2008), the defendants argued that the plaintiff's negligence claims against a pharmacy and a non-pharmacist employee for dispensing a toxic dose of medication were actually time-barred medical malpractice claims.  However, the Michigan Supreme Court disagreed, finding that because only the types of healthcare professionals and entities listed in M.C.L. §600.5838a -- which include

---

[2] Although the CHM Defendants argue that the court's decision in *Cox* narrowed the scope of liability outlined in *Theophelis*, *see* CHM Defs' Appellee Br. 27, there is no basis for that assertion.  The *Cox* court restricted its discussion to the liability of hospitals because a hospital was the defendant in that case.

licensed pharmacists, but not a pharmacy or non-pharmacist employees of a pharmacy -- could be sued for malpractice, all other entities must be sued for negligence for harm arising out of the same set of facts. *Id.* at 126-127.

Defendants also argue that they are immune from liability because they are merely board members of a hospital's Catholic sponsor "and therefore distinct from other hospital policymakers." CHM Defs.' Appellee Br. 15. But no such distinction exists. By their own admission, CHM "adopt[ed] the Directives for Trinity Health facilities" which, they acknowledge, includes Ms. Means's hospital, MHP. CHM Defs' Reply Br., R. 50, Page ID #1416. Pursuant to Michigan statute, the defendants, as members of the unincorporated association CHM, can be individually sued for the acts of CHM, such as its policymaking for MHP. Mich. Comp. Laws §600.2051(2). [3]

B.   Multiple Jurisdictions Recognize Negligence Claims Arising out of Hospital Policies Against Entities Other than Hospitals.

Even if the district court found that Michigan Supreme Court precedent did not conclusively establish a duty by the CHM Defendants to Ms. Means, in the absence of negative precedent, the court was required to consider case law from other states to determine whether a duty exists. *See Garden City Osteopathic*

---

[3] In fact, Defendant Mollison signed CHM's amended by-laws that require Trinity hospitals (including MHP) to follow the Directives. Pl. Opp'n to Def. Mot. to Change Venue, Ex. B, R. 22-3, Page ID # 236.

*Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995). Like Michigan, multiple

other jurisdictions recognize a duty of care arising out of hospital policies against

defendants other than the hospital itself. Courts have therefore allowed negligent

hospital policymaking claims against an outside hospital management company,

*see Chesser v. LifeCare Mgmt Services., L.L.C.*, 356 S.W.3d 613 (Tex. Ct. App.

2011), a board of directors, *see Corleto v. Shore Memorial Hosp.*, 350 A.2d 534,

537 (N.J. Super. Ct. Law Div. 1975), and a hospital's foundation, *see Armstrong v.

A.I. Dupont Hosp. for Children*, 60 A.3d 414, 420-21 (Del. Super. Ct. 2012).

The CHM Defendants' attempts to distinguish these cases are unavailing.

For example, they attempt to distinguish *Chesser* by pointing out that its

policymaking duty was explicitly set forth in the management company's bylaws.

However, the court looked to the company's bylaws to determine whether it had

policymaking *responsibility* over the hospital, not whether a duty existed. The

court had already explained that a duty exists "to use reasonable care in

formulating the policies and procedures that govern the hospital's medical staff and

nonphysician personnel." 356 S.W. 3d at 629. Further, as Ms. Means alleged in

her Complaint and subsequent motions, CHM's policymaking responsibility for

MHP is clearly set forth in its bylaws and the hospital's corporate documents.

Compl. ¶¶86-87, 91-92, R.1, Page ID ## 12-13. Likewise, the CHM Defendants'

argument that *Armstrong* is inapposite because it rests on Delaware law, CHM

Defs.' Appellee Br.19-20, completely misses the point—the district court was supposed to consider other state law.

The unifying thread between these cases is the plaintiff's allegation that the defendant was involved in setting hospital policy. Each court thus focused on the defendant's policymaking function, not their structure, to determine whether they owed a duty to plaintiff and were subject to negligence liability. The same principle applies here.

C.    The Special Relationship Test Does Not Apply to Claims Arising Out of the Defendants' Own Negligent Acts.

Although the Defendants repeatedly ask this Court to ignore the well-established duty owed by hospital policymakers to patients and analyze this issue separately under the special relationship framework, this Court has already rejected that argument. In a decision applying Michigan tort law, the Sixth Circuit expressly stated the special relationship test does not apply when the defendant is accused of negligence for its own acts, rather than for failing to protect the plaintiff from a third party's acts. *Rupert v. Daggett*, 695 F.3d 417, 423-424 (6th Cir. 2012). As stated above, Ms. Means's claim against the CHM Defendants arises out of CHM's independent act of adopting the Directives as policy for MHP, not

out of CHM's failure to protect her from harm committed by third parties at that hospital. Accordingly, the special relationship test does not apply.[4]

This principle is buttressed by a case the CHM Defendants' cite, *see* CHM Defs.' Appellee Br. 24, which explains that duties in the healthcare context go beyond the special relationship:

> [E]ven in the absence of a professional-patient relationship, Michigan's common law imposes on every person a general obligation to refrain from taking actions that unreasonably endanger others: every person engaged in the prosecution of any undertaking [has] an obligation to use due care, or to so govern his [or her] actions as not to unreasonably endanger the person or property of others.

*Roberts v. Saimi*, 866 N.W.2d 460, 466 (Mich. Ct. App. 2014) (internal citations omitted).

However, even if the court finds the special relationship test applies, it is certainly met here. Although the CHM Defendants contend that they lack the requisite "special relationship" with Ms. Means because MHP staff "had full control over [Ms. Means's] care," CHM Defs.' Appellee Br. 23, this assertion is contrary to Ms. Means's allegations -- which must be accepted as true here -- that the CHM Defendants adopted the Directives as *binding* policy for MHP. In doing so, the CHM Defendants asserted control over MHP's treatment decisions and,

---

[4] The CHM Defendants' attempt to discount the Michigan precedent that Ms. Means cites on the ground that the negligence actions were premised on a special relationship between the hospital and plaintiff fails. CHM Defs' Appellee Br. 24, 26. In no instance did the courts rely on a special relationship to find that plaintiff had a claim against the defendant for its policymaking acts.

consequently, control over Ms. Means's ability to access appropriate care. Compl.
¶¶ 86–87, 89, 91–93, R. 1, Page ID ##12–13. It is precisely this "imbalance of
control" that justifies recognizing a special relationship under the common law.
*Bailey v. Schaaf*, 835 N.W.2d 413, 418–19 (Mich. 2013).

The fact that the CHM Defendants never personally met Ms. Means is
irrelevant. *See* CHM Defs.' Appellee Br.23. Instead, the focus is on the degree of
control one party has over another.[5] By limiting the care that MHP could provide
Ms. Means, the CHM Defendants exercised control over MHP's treatment options,
to the detriment of Ms. Means. The CHM Defendants "should not be allowed to
wash [their] hands of responsibility [for their policies]" simply because MHP
personnel carried them out. *Stiver v. Parker*, 975 F.2d 261, 272 (6th Cir. 1992)
(applying Michigan negligence law).

* * *

There is no question that multiple people failed Ms. Means. But this does
not release the CHM Defendants from liability for setting hospital policy that

---

[5] This is apparent even from cases the CHM Defendants cite. *See* CHM Defs.'
Appellee Br. 23. The court's decision in *Murdock v. Higgins* turned on the fact
that the supervisor had no control over operations at the other department. 527
N.W.2d 1, 3 (Mich. Ct. App. 1995). And, in *Downs v. Saperstein Assocs Corp.*,
the court found no special relationship between the deceased and the fire chief
because the chief "did not participate in the firefighting or in any decision relating
to the fire on that day" and thus did not exercise control over the situation. 697
N.W.2d 190, 193 (Mich. Ct. App. 2005). Here, in contrast, the CHM Defendants
actually made the decision to implement policy prohibiting the treatment and
information that Ms. Means needed.

required Ms. Means's physicians to deny her the emergency care she needed. The CHM Defendants have, in fact, not cited to a single case, in Michigan or elsewhere, where policymakers were found not to owe a duty of reasonable care to patients, such as Ms. Means.

In the absence of any case law holding that the CHM Defendants cannot be liable, and given the multiple cases holding that policymakers are subject to negligence liability, regardless of their associational structure, there was no basis for the district court's finding that the CHM Defendants lacked a duty to Ms. Means. Rather, adherence to the requirement that a federal court sitting in diversity must consider *all relevant data* to determine state law, including state appellate court decisions, state supreme court *dicta,* and law from other states, *see Garden City Osteopathic Hosp.*, 55 F.3d at 1130, compels the conclusion that hospital policymakers, whether the hospital itself or another entity, such as a nonprofit board or foundation (or sponsor like CHM), have a duty to patients and are liable for harm that results from their policies. Therefore, this Court should reverse on this issue.

## II.    **The First Amendment Does Not Bar Ms. Means's Claim.**

This case is about the negligence of hospital policymakers that resulted in Ms. Means not receiving proper emergency medical care. Similar to the negligence cases discussed above, Ms. Means's negligence claim can (and should)

11

be analyzed under traditional principles of tort law. This is not a case between warring factions of a church over which faction had abandoned the church's tenets, *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449-450 (1969), or a case between a church and its employee about whether the employee was properly defrocked under a church's penal code and constitution, *Serbian Eastern Orthodox Diocese for the U.S. and Canada v. Milivojevich*, 426 U.S. 696, 718 (1976). Rather, this case is about whether those who set hospital policy can be held liable for adopting a policy that they should have reasonably foreseen would harm patients.

The Supreme Court has never held that the First Amendment bars a case like the instant action. In fact, Justice Rehnquist explicitly warned against extending the application of the church autonomy doctrine to suits involving non-church parties. *Gen. Council on Fin. & Admin. of the United Methodist Church v. Super. Ct. of Cal.*, 439 U.S. 1355, 1372-73 (1978) (Rehnquist, Circuit Justice) (distinguishing *Serbian Eastern Orthodox Diocese* from "secular disputes between third parties" and a religious organization, and noting that the Court has never implied that under the cloak of religion persons may "commit frauds upon the public."). Therefore, as demonstrated in Ms. Means's opening brief, this case does not fall within the very narrow class of intra-church disputes that courts are barred from entertaining.

12

In response, Defendants make essentially two arguments, neither of which has merit.  First, they repeatedly argue that adjudicating this case will require the Court to pass on the "reasonableness" of the Directives, and that "Ms. Means wants to strip a religious entity of its theological and moral beliefs."  CHM Defs' Appellee Br. 34.  But this is incorrect.  The CHM Defendants are entitled to their religious beliefs, and Ms. Means does not seek judicial review of whether those beliefs are "reasonable" or whether CHM can hold those religious beliefs.  However, by establishing the Directives as binding hospital policy, the CHM Defendants can be held accountable for the secular effects of that policy, just as any other negligence claim against any hospital policymaker can be adjudicated.  Thus, all this case requires is the application of neutral principles of law to determine whether the CHM Defendants were negligent for setting a hospital policy that harmed Ms. Means.

Second, Defendants argue that the Court is barred from entertaining this suit because it requires interpretation of the Directives.  The CHM Defendants claim that the Court will have to answer questions about the Directives, such as what constitutes a "morally legitimate alternative" to pregnancy termination, or a "direct abortion."  CHM Defs.' Appellee Br. 33.  That is simply not true.  The CHM Defendants have never disputed that the Directives would have barred pregnancy

termination in Ms. Means's situation.  Based on that implicit admission alone no interpretation of the Directives is needed.

But even if the Directives needed to be interpreted, this Court would still have jurisdiction to hear Ms. Means's claim.  For example, in *Jones v. Wolf*, the Supreme Court said that a court may "examine certain religious documents" to assess the legal claim as long as the court "take[s] special care to scrutinize the document in purely secular terms."  443 U.S. 595, 604 (1979).  In that case, the Court held that the lower court could look to a church constitution to determine whether it created a trust in favor of one schism of the church.  If interpretation of the document required the court to "resolve a religious controversy," the proper course is not dismissal of the case but rather "the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body."  *Id.*  The same is true here.  This Court can review the Directives in determining whether the CHM Defendants are negligent, but if this Court becomes concerned that it might wade into a "religious controversy," the Court can defer to CHM's interpretation of what the Directives mean.

Furthermore, the Directives are an external, public, document explicitly intended for a secular audience such as "physicians, health care personnel, and patients or residents" of Catholic health care institutions, and they pertain to a secular service, namely the provision of health care.  CHM Defs.' Mot. to Dismiss,

14

Ex. B, R. 42-3, Page ID #932.  The Catholic Church's interpretation of these Directives is largely irrelevant; rather, the issue here is whether it was foreseeable for medical staff to rely on the Directives to deny Ms. Means the appropriate medical care.  Ms. Means has alleged that is precisely what happened.  See Compl. ¶¶ 57, 95, R. 1, Page ID ##8, 14.  That is a secular inquiry that this Court is competent to adjudicate.[6]

The approach endorsed in *Jones* was followed by this Court in *General Conference Corporation of Seventh-Day Adventists v. McGill*, 617 F.3d 402 (6th Cir. 2010).  In that case, the defendant split from the Seventh Day Adventist Church over a theological dispute, and formed his own church called "A Creation Seventh Day & Adventist Church."  *Id*. at 405.  The defendant knew that the plaintiff had trademarked the name "Seventh Day Adventist" but "he used it anyway, because he believed that he was divinely mandated to do so."  *Id*.  The defendant argued that the courts were precluded from exercising jurisdiction under the First Amendment because of the presence of a doctrinal dispute, namely "who

---

[6] Furthermore, whether the local bishops enforce the Directives as to MHP is irrelevant to CHM's duty to Ms. Means.  Ms. Means's claim is that CHM is the entity that implemented the Directives as hospital policy for MHP, and that it was reasonable for CHM to foresee that MHP would follow the policy it imposed to refuse to provide Ms. Means an abortion.  Ms. Means has alleged that MHP did in fact rely on the Directives in that manner.  *See, e.g.*, Compl. ¶¶ 2, 57, R. 1, Page ID ##2, 8.

are the 'true' Seventh-day Adventists." *Id*. at 408.  This Court rejected that argument based on *Jones* and its progeny, and held that there was no religious dispute given that both parties believed that the "second coming of Christ is imminent and that the Sabbath should be celebrated on Saturday." *Id*.  Moreover, "[t]rademark law will not turn on whether the plaintiffs' members or McGill and his congregants are true believers." *Id*. at 409.  Rather, neutral principles of trademark law can be applied to evaluate the claim, and the "'defendants can raise neutral defenses, such as prior use of the marks.'" *Id*. at 408 (citing *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1249 (9th Cir. 1999)).  The same is true here.  There is no dispute over any religious issue, especially because CHM does not dispute that the Directives prohibited MHP from providing Ms. Means an abortion, and this case can be resolved using neutral principles of tort law.

Furthermore, contrary to the CHM Defendants' arguments, this Court's decision in *Ogle v. Hocker*, 279 Fed. App'x 391 (6th Cir. 2008), supports Ms. Means's claim.[7]  In *Ogle*, this Court allowed a defamation case to proceed by one bishop against another based on neutral principles of law, despite the fact that the defamatory statements were made in a sermon.  Although the CHM Defendants are

---

[7] *Ogle v. Church of God*, 153 Fed. App'x 371, 376 (6th Cir. 2005), is inapplicable here because it "implicate[d] the Church of God's internal disciplinary proceedings," which the Supreme Court has said is off limits to secular courts.

correct that this Court said in *dicta* that "our power to adjudicate [Ogle's] claims would be doubtful" *if* the defendant claimed that "defamation is a practice of his church or otherwise rooted in religious beliefs," *id*. at 396, this Court simultaneously noted that any First Amendment concerns disappear "where a pastor or other religious figure is offering secular services, since secular [legal] standards can be applied."  *Id*. at 395 n.4.  Moreover, in *McGill* this Court rejected the defendant's First Amendment argument even though the defendant argued that "he was divinely mandated" to use the trademarked name "Seventh Day Adventist" for his church.  617 F.3d at 405.

Simply put, this Court has repeatedly held that where neutral principles of law can be used to adjudicate a secular claim, religious motivation for violating the law does not deprive the court of jurisdiction.  As in *Ogle* and *McGill*, this Court should reject the CHM Defendants' First Amendment argument.  The CHM Defendants set policy for secular services -- medical care --  and secular tort law can be applied to this case; their religious motivation for the policy cannot shield them from liability.  Indeed, simply because the hospital policy at issue is motivated by religious beliefs does not insulate it from review any more than a religiously motivated racially discriminatory policy could be shielded from review. *See, e.g., Bob Jones University v. United States*, 461 U.S. 574 (1983) (holding that nonprofit schools that enforce racially discriminatory admission standards do not

17

qualify for tax-exempt status even if those policies are motivated by religious doctrine).[8]

Moreover, in attempting to distinguish *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999), the CHM Defendants conveniently ignore that the court specifically held that it was proper for the jury to consider whether, as a matter of fact, religious tenets gave rise to a fiduciary duty between the Diocese and a victim on sexual abuse. *Id*. at 431. In words that are no less applicable here, the court explicitly held that "[t]he First Amendment does not prevent courts from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters." *Id*. (citing *Jones*, 443 U.S. at 603). Just as in *Martinelli*, Ms. Means is not asking this Court to "assess [Directive 45's] truth or validity or the extent of its divine approval or authority," *id*. at 431, but instead is solely asking this Court to assess whether the CHM Defendants can be negligent for adopting hospital policy that harms patients.[9]

---

[8] CHM Defendants' citation to *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 132 S. Ct. 694 (2012), CHM Defs.' Appellee Br. 35, a case involving whether religious entities can select their ministers, is entirely misplaced. This Court has explicitly held that the "ministerial exception is a highly circumscribed doctrine," and has no application to the neutral-principles approach outlined in *Jones v. Wolff*. *McGill*, 617 F.3d at 409.

[9] Moreover, contrary to the CHM Defendants' representation, CHM Defs' Appellee Br. 38 n.16, the Minnesota court in *Lundman v. McKown*, 530 N.W.2d

18

The CHM Defendants also provide no real counterargument to Ms. Means's concern that the District Court crossed the line between accommodation of religious beliefs, and the establishment of religion. *See, e.g.*, *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005); *Est. of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709–10 (1985). In any event, this Court doesn't need to go so far as to find that the District Court's decision violated the Establishment Clause. Rather, Ms. Means highlights this point to demonstrate that religious entities are not entitled to a blanket exemption from the rule of law. As the Florida Supreme Court held, "[t]hrough neutral application of tort law, we thus give no greater or lesser deference to tortious conduct committed on third parties by religious organizations than we do to tortious conduct committed on third parties by non-religious entities." *Malicki v. Doe*, 814 So.2d 347, 361 (Fla. 2002); *see also McKelvey v. Pierce*, 800 A.2d 840 (N.J. 2002) (holding that churches are not above the law, and like a person or entity, they may be held liable for their torts). CHM is entitled to its religious beliefs, but those religious beliefs cannot be the basis for a free pass to harm members of the public.

---

807 (Minn. 1995), did not find that the First Church owed no duty to the boy who died at the hands of faith healers, but rather that, as a factual matter, there was never any agreement between [the faith healers and the First Church] that manifested either consent or a right of control"). *Id*. at 825. In contrast, CHM imposed the Directives on MHP, Compl. ¶¶ 86, 89, R. 1, Page ID ##12, 13, which then led MHP to deny Ms. Means proper care, *id*. ¶¶ 56–57, R. 1, Page ID #8.

19

## III.  **USCCB is Subject to Personal Jurisdiction in Michigan.**

### A.    USCCB Waived its Personal Jurisdiction Defense.

This Court, as well as several others, has held that where a defendant files a responsive pleading, as USCCB did when it sought dismissal for improper venue, and subsequently, in a separate pleading, seeks dismissal based on lack of personal jurisdiction, that defense is waived.  *See Taubman Co. v. Webfeats*, 319 F.3d 770, 773 (6th Cir. 2003); *Palmer v. Braun*, 376 F.3d 1254, 1259 (11th Cir. 2004); *Myers v. Am. Dental Ass'n*, 695 F.2d 716, 721 (3d Cir. 1982).

USCCB contends it is not subject to this rule because it filed a special appearance, but this finds no case support.  *See* USCCB Appellee Br. 39.  In *Gerber v. Riordan*, a case USCCB relies on, this Court stated "that a personal jurisdiction defense is not waived when a party makes a special appearance *solely* to contest personal jurisdiction's existence . . . This is so because by appearing *solely* to contest jurisdiction, a defendant clearly indicates that he is not willing to submit to the district court's jurisdiction."  649 F.3d 514, 520 (6th Cir. 2011) (emphasis added).  Thus, a party cannot simultaneously litigate non-personal jurisdiction defenses, such as improper venue, and invoke the protection of a special appearance. Yet, that is precisely what USCCB aimed to do.

Contrary to USCCB's assertion, they did not have to seek dismissal based on improper venue when their co-defendants moved for a change of venue.

20

USCCB, on its own volition, decided not only to join its co-defendants' motion to change venue -- which in and of itself is beyond the scope of a special appearance -- but also separately to seek outright dismissal based on improper venue, a form of relief the CHM Defendants did not seek.[10]  And, it chose to do so before seeking dismissal for lack of personal jurisdiction.  USCCB has therefore waived its personal jurisdiction defense and is subject to suit in Michigan.  *See Taubman Co.*, 319 F.3d at 773.

### B. USCCB is Subject to Jurisdiction for Claims Arising out of the Policies that it Purposefully Directed Towards Michigan.

Even if this Court finds that USCCB did not waive its personal jurisdiction defense, recent Sixth Circuit cases demonstrate that personal jurisdiction over USCCB is proper.[11]

Prior to discovery, Ms. Means was required only to put forth *prima facie* evidence of personal jurisdiction to meet a "relatively slight" burden.  *Air Prods. & Controls, Inc. v. Safetech Int'l Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (internal

---

[10] USCCB argues that Ms. Means incorrectly characterized USCCB's request for dismissal as a "motion."  *E.g.*, USSCB Appellee Br. 10.  However, the self-serving label that USCCB chose is not dispositive.  USCCB filed a document that sought relief from the court -- and, more specifically, relief that no other party before the court was seeking.  It is difficult to describe such a written request as anything other than a motion.  *See* Fed. R. Civ. P. 7(b).

[11] Although USCCB discusses general jurisdiction at length in its brief, *see* USCCB Br. at 22-27, Ms. Means asserts that specific jurisdiction, not general jurisdiction, exists over USCCB.  *See* Pl. Opening Br. at 45.

citations omitted).  As outlined in her opening brief, Ms. Means has met that burden.

In its response, USCCB attempts at length to recast the Directives as a mere statement of belief (not a mandate, as the plain meaning of the term "Directive" would imply[12]), solely to inform anyone who might be interested about the Catholic Church's opinion on various forms of health care.  This is belied by the very title and terms of the Directives, which state, *inter alia*, "Catholic health care services *must* adopt these Directives as policy, [and] *require* adherence to them within the institution as a condition for medical privileges and employment . . . ." Pl.'s Opp'n to USCCB Mot. to Dismiss, Ex. 1, R. 46-2, Page ID #1100 (emphasis added).  It is particularly disingenuous for USCCB to claim that the purpose of the Directives is solely to "inform Catholics who provide health care about the Church's teachings," USCCB Appellee Br. 32, when USCCB mandates that Catholic hospitals require adherence to the Directives as a condition of employment.

Given USCCB's obvious intent that Catholic health care services adopt and require adherence to the Directives, this Court's decision in *Schneider v. Hardesty*, 669 F.3d 693 (6th Cir. 2012), discussed by Ms. Means in her opening brief,

---

[12] "Directive" is defined as "having the quality or function of directing, authoritatively guiding, or ruling (adj.) or "a general instruction how to proceed or act (n.)." http://www.oed.com/view/Entry/53305?redirectedFrom=Directive#eid

provides incontrovertible support for the exercise of personal jurisdiction here. USCCB's strained attempt to distinguish this case clearly fails.

Initially, USCCB contends *Schneider* is inapposite because it involved fraudulent representations rather than the non-fraudulent representations at issue here. However, the fraud did not form the basis for this Court's analysis. Rather, the court focused on whether the attorney wrote the words at issue with the intent that investors rely upon them. *Id*. at 702-703. That is directly analogous to Ms. Means's allegations that USCCB drafted the Directives with the intent that her hospital rely upon them.

Next, USCCB contends that *Schneider* is inapplicable because USCCB has no "legally cognizable relationship" with the persons who physically interacted with Ms. Means. USCCB Appellee Br. 35-36. But, USCCB's contention is misleading. USCCB has a relationship with Trinity Health -- the parent company of Ms. Means's hospital -- in that Trinity Health sought, and USCCB granted, Trinity Health inclusion in its IRS tax-exempt ruling. Pl.'s.Opp'n to USCCB Mot. to Dismiss, Exs. 10-11, R. 46-11, 46-12, Page ID ## 1211, 1233. Indeed, USCCB noticeably fails to mention this relationship or transaction at all.

Regardless, USCCB's contention is irrelevant because the existence of a "legally cognizable relationship" between the attorney in *Schneider* and the Ohio resident who received the fraudulent letters was never a factor in this Court's

23

analysis -- in fact, no such relationship existed.  Purposeful direction is based on the relationship between the defendant and the *forum*, not between the defendant and the plaintiff.  *See Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 505-06 (6th Cir. 2014).

USCCB's remaining arguments also fail.  USCCB faults Ms. Means for not asserting the same basis for purposeful availment -- the first prong of the personal jurisdiction analysis -- asserted in *Southern Machine Co. v. Mohasco Industries*, 401 F.2d 374 (6th Cir. 1968), where the plaintiff had a licensing agreement with the defendant.  However, that case provided several examples of purposeful availment that did not involve a licensing agreement, including "[t]he soliciting of insurance by mail [and] the transmission of radio broadcasts into a state[.]"  *Id.* at 382.

Further, while the question in *Southern Machine* concerned whether the defendant "purposefully availed itself of the privilege of transacting business in [the forum state.]," *id.*, as this Court stated in *Beydoun*, that is not the exclusive means of analyzing the purposeful availment prong.  Rather, "the purposeful availment prong includes both purposeful availment and purposeful direction.  It may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination

thereof." 768 F.3d at 506 (internal citations omitted). Ms. Means focuses on purposeful direction here, as did this Court in *Schneider*.

USCCB also claims that Ms. Means is basing the exercise of personal jurisdiction on another's unilateral activity. USCCB Appellee Br. 33. This is belied by the facts. As explained in the case USCCB cites, *Burger King Corporation v. Rudzewicz*, personal jurisdiction cannot be based on "random," or "fortuitous," contacts. 471 U.S. 462, 475 (1985). However, there is nothing random or fortuitous about MHP, a Catholic hospital, adhering to the mandate set forth in USCCB's Directives when it treated Ms. Means -- rather, that was the precise action required by the Directives. See *supra* at 22.

Finally, USCCB uses a straw man to claim that exercise of jurisdiction here necessarily means that "personal jurisdiction would be properly asserted anywhere in the United States against any person or entity expressing religious views, for doing nothing more than expressing them." USCCB's Appellee Br. 37. As explained above, this is simply inaccurate. It is USCCB's creation of mandatory healthcare policies, not its expression of religious belief, which underlies Ms. Means's claims.

In sum, USCCB has not demonstrated why this Court's analysis in *Schneider* is inapplicable here. Because Ms. Means has clearly met her *prima*

25

*facie* burden of demonstrating personal jurisdiction over USCCB, the district court's contrary finding should be reversed.

## IV. The District Court Erred in Granting Defendants' Motion to Change Venue.

In arguing that venue was improper in the Eastern District of Michigan under 28 U.S.C. § 1391(b)(2), Defendants misunderstand both the burden standard and what acts are sufficient to establish proper venue.

Even in jurisdictions where plaintiff bears the burden, absent an evidentiary hearing, a plaintiff is required only to make a prima facie showing of venue. *See, e.g.*, *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005); *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004). In the absence of evidence contradicting Ms. Mean's well-pled allegations that CHM adopted the Directives as binding policy for MHP in the Eastern District, or her evidence that CHM was at all relevant times based in that district, Ms. Means was entitled to rely upon her uncontroverted statements and evidence to show venue was proper in the Eastern District. At a minimum, she was entitled to limited discovery to gather more evidence of CHM's policymaking acts in the Eastern District. The District Court's ruling to the contrary was in error.

Defendants' argument that a single event alone cannot support venue is wrong. CHM Defs.' Appellee Br. 41–42; USCCB Appellee Br. 47. Even one event in the chosen forum is sufficient where it is a substantial part of "the entire

26

sequence of events underlying the claim." *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001) (citing *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 263–64 (6th Cir. 1998)) (jurisdiction where one event underlying the claim occurred was proper venue). CHM's adoption of the Directives as binding hospital policy, as intended by USCCB, resulted in Ms. Means being denied care at MHP. This event is undoubtedly a substantial part of her claims.

Additionally, the CHM Defendants' argument that adoption of the Directives cannot support venue because that action was taken by a non-party, CHM, is wrong. CHM Defs.' Appellee Br. 41. As explained *supra* at 6, CHM's actions are attributable to the individual CHM Defendants. Further, the venue test is *not* based on any defendant's contacts with a particular district but on the connection between events occurring in that district and the underlying claim. *See Uffner*, 244 F.3d at 42–43. CHM's adoption of the Directives is central to establishing elements of the claims against both CHM Defendants and USCCB.

With respect to change of venue, as Plaintiffs already explained, Appellant Br. 60, while a district court has discretion under §1404(a), a presumption is owed to a plaintiff's choice of forum and defendants must make a "strong case for transfer." *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 113-14 (2d Cir. 2010); *see also Reese v. CNH Am., LLC*, 574 F.3d 315, 320 (6th Cir. 2009). Contrary to the CHM Defendants' assertion, Ms. Means does not take issue

with the district court for assigning less weight to her chosen venue because she does not reside there, *see* CHM Defs. Appellee Br. 43; rather, she contends the court erred by not assigning *any* deference at all to her chosen forum as required. *See* Dist. Ct. Op., R.31, Page ID # 31 (stating this factor is neutral as to the parties, rather than weighing it in Ms. Mean's favor).  This alone is an abuse of discretion warranting reversal.

Additionally, contrary to the CHM Defendants' contention, the § 1404(a) factors support venue in the Eastern District.  *See* CHM Defs.' Appellee Br. 44. Ms. Means filed in a district where an event pivotal to her claims occurred and where witnesses, documents, and relevant facts are likely to be located.  *See* Pl.'s Opp'n to CHM Defs.' Mot. to Change Venue, R. 22, Page ID ##214–20. Similarly, USCCB's cases are inapposite as they all concern plaintiffs who did not allege that *any* events central to their claims occurred in their chosen forum.  *See* USCCB Appellee Br. 44.  Further, in none of these cases did the court impose the high burden of proof that the District Court here imposed on Ms. Means.  The District Court's opinion should be reversed.

## <u>CONCLUSION</u>

Ms. Means went to the only hospital in her county multiple times seeking emergency treatment for her miscarriage.  Because of policies drafted by USCCB and imposed on Ms. Means's hospital by the CHM Defendants, she did not receive

proper care and suffered immensely.  Negligence claims based on hospital

policymaking, such as the claims Ms. Means asserts, are well-recognized and can

be decided under purely secular principles of tort law.  Accordingly, Ms. Means

requests that this Court reverse the district court's decision.

Respectfully submitted,

| | |
|---|---|
| | /s/ Brooke A. Merriweather-Tucker |
| Brigitte Amiri | Brooke A. Merriweather-Tucker |
| Alexa Kolbi-Molinas | Daniel S. Korobkin |
| Louise Melling | Michael J. Steinberg |
| Jennifer Dalven | Kary L. Moss |
| Alyson Zureick | American Civil Liberties Union |
| American Civil Liberties Union |   Fund of Michigan |
|   Foundation | 2966 Woodward Ave. |
| 125 Broad St., 18th Floor | Detroit, MI 48201 |
| New York, NY 10004 | (313) 578-6823 |
| (212) 549-2633 | btucker@aclumich.org |
| bamiri@aclu.org | |
| | Don Ferris |
| | Cooperating Attorney, American Civil |
| |   Liberties Union Fund of Michigan |
| | Ferris & Salter, P.C. |
| | 4158 Washtenaw Ave. |
| | Ann Arbor, MI 48108 |
| | (734) 677-2020 |

*Attorneys for Plaintiff-Appellant Tamesha Means*

Dated: April 4, 2016

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the word counting feature of counsel's word processing programs shows that this brief contains 7,000 words or less, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

<u>/s/ Brooke A. Merriweather-Tucker</u>
Brooke A. Merriweather-Tucker

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 4, 2016, the foregoing document was filed through the court's electronic filing system, and that it was served electronically on all counsel of record through the court's electronic filing system.

<u>/s/ Brooke A. Merriweather-Tucker</u>
Brooke A. Merriweather-Tucker